**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:21-cv -1421-GPG

ERIC KING,
         Plaintiff,

v.

UNITED STATES OF AMERICA, FEDERAL BUREAU OF
PRISONS,
CATHY GOETZ, former Warden FCI Florence,
D.K. LENNON, Acting Warden FCI Florence,
NICOLE ENGLISH, Regional Director and Former Warden, USP
Leavenworth,
JOHN F. WILLIAMS, Warden, FCI Englewood,
ERLINDA HERNANDEZ, Associate Warden, FCI
Florence, TONYA HAWKINS, Warden, FCI Florence,
DONALD WILCOX,
JEFFREY KAMMRAD,
ROBERT GICONI,
DUSTIN GUSTAFSON,
KEVIN CARROLL,
RICHARD WHITE,
ALFRED GARDUNO,
TERRA BRINK [NOW TERRA MAINE],
MICHELLE ABRAHAM,
LEANN REYNOLDS,
RONALD BATOUCHE,
LOREENA FRABONI,
D. CHRISTENSEN,
MARK MELVIN,
LIEUTENANT JARED HERBIG, Special Investigative Services, USP
Leavenworth,
LIEUTENANT QUEZADA, Special Investigative Services, FCI
Englewood,
CAPTAIN SAPP,
LIEUTENANT STARCHER,
JOHN DOES 1-10, Unknown Federal Agents or Employees (FCI/USP Florence Does and
USP Leavenworth Does and FCI Englewood Does),
JOHN DOES 11-15, Segregation Review Officials (SRO) for USP Leavenworth, USP
McCreary and FCI Englewood, and
 JOHN DOES 16-20, Unknown Federal Agents or Employees of the United States
Marshal Service
 ANDRE MATEVOUSIAN, Current Regional Director North Central Bureau of
Prisons, Former Warden of Florence Correctional Complex and Florence
Administrative Maximum

1

LIEUTENANT DAVID HUMPHRIES,
LIEUTENANT ROBERT CORDOVA, Special Investigative Services, FCI Florence
JASON WILCOX, USP Florence Correctional Officer,
BRADLEY GRIELICK, WARDEN FCI Englewood

---

## FOURTH AMENDED COMPLAINT
## FOR VIOLATIONS OF CIVIL
## RIGHTS/*BIVENS*, FEDERAL TORT
## CLAIMS ACT, and ADMINISTRATIVE
## PROCEDURE ACT

### JURY TRIAL DEMANDED (for *Bivens* and FTCA Claims)

---

## I.      INTRODUCTION

**"It has long been said that a society's worth can be judged by taking stock of its prisons…May we hope that our country's facilities serve as models rather than cautionary tales."**

Justice Sonya Sotomayor, *Valentine v. Collier*, 206 L. Ed. 2d 930, 140 S. Ct. 1598, 1601 (2020).

1.      The United States Constitution is meaningless when government institutions refuse to yield to its dictates or enforce its protections. They become a mechanism of unabated power and senseless tyranny, and as a result all of society becomes what we call "prisoner."

### A Cautionary & Sinister Tale

2.      Regarded as a political prisoner by international standards[1], Plaintiff to this action, Eric King (hereinafter 'Mr. King'), has and continues to be subject to ghoulish physical torture, credible threats of death, and serious bodily injury by violent white supremacists-deliberately

---

[1] Parliamentary Assembly of the Council of Europe (PACE), *Resolution 1900-Definition of Political Prisoner*, 2012, https://pace.coe.int/pdf/af0777c4da96235fad8dc75732e47687265aa9aa2ba55882e05ba329b49f87a3/resolution%201900.pdf, (last visited February 10, 2023).

served up to them by various United States Bureau of Prisons (hereinafter "BOP") employees and/or agents named here as Defendants. The Defendants have engaged in an ongoing racially and ideologically-motivated conspiracy to deprive antiracist, antifascist Wiccan Mr. King of exercise of his rights; the Defendants have taken overt acts in furtherance of the unlawful agreement, to include assault, battery, torture, and manipulation of Mr. King's security level, housing and communications restrictions through baseless and retaliatory investigations and disciplinary proceedings.

3.      For example, in August 2018 the Florence Defendants brutally beat Mr. King and then, while he was injured and totally compliant, strapped him into a four-point restraint platform with no medical attention.  Mr. King was restrained so long he twice urinated on himself and was held *incommunicado* for days. This is the very kind of cruel and unusual punishment the U.S. Constitution contemplates as wholly impermissible. *See United States. v. Eric King*, 1:19-cr-0257, Docket No. 176, J. Martinez Order.


3.       To date, the BOP has held Mr. King in segregated housing, otherwise known as solitary confinement, for thousands of days, denying him any explanation or any meaningful process to be heard, the right to exercise his religious beliefs, consume vegan meals, and interfering with communications to and from his legal counsel.

4.      Utilizing every means to obfuscate their abusive actions, the Defendants at various BOP facilities resort to intimidation, including the threat of assault and purposeful endangerment, and extreme isolation of Mr. King from attorneys and his family, denial of medical treatment - even refusing Mr. King writing instruments and materials to record and properly submit official grievances required by law.

5.       Ultimately, the attempts by the Florence Defendants to conceal the truth about the August 17, 2018 group assault and torture of Mr. King culminated in criminal indictment of

Mr. King for an alleged assault against the FCI Florence Lieutenant responsible for his torture, Defendant Donald Wilcox (hereinafter "Defendant Wilcox").  Transparently false and politically motivated charges, on March 18, 2022, a jury of Mr. King's peers acquitted him of all charges regarding Defendant Wilcox. *See United States v. Eric King*, 1:19-cv-0257-WJM, Doc. No. 245 (March 21, 2022 Acquittal order)

6.        Mr. King's beliefs, including his religious practice of magic, veganism, anti-racist and anarchist political beliefs are well known. These beliefs served as the impetus for the Defendants' unconstitutional treatment of Mr. King. Indeed, at his sentencing, Mr. King spoke with unmistakable clarity as to the political rationale for his original nonviolent offense: ***"The government in this country is disgusting. The way they treat poor people, the way they treat brown people, the way they treat everyone that's not in the class of white and male is disgusting, patriarchal, filthy, and racist."*** *See* Exhibit 1: *United States v. Eric G. King*, 14-00286-01-CR-W-GAF (W. D. Missouri, Doc. No. 47, June 28, 2016 Sentencing Transcript)

7.        Upon information and belief, Mr. King is known by the BOP employees, agents, contractors, and other incarcerated people as antifascist or "Antifa." The year of Mr. King's arrest, Presidential Candidate Donald Trump characterized the Ferguson, Missouri uprisings following the murder of Michael Brown as "riots" and "looting."[2] A mere two years following Mr. King's 2018 torture, on May 31, 2020, former President Donald J. Trump officially announced demonization of First Amendment activity on full display via Twitter, stating that the "United States will be designating ANTIFA as a Terrorist Organization."[3]—

---

[2] @realDonaldTrump, TWITTER, (November 25, 2014, 2:25 AM EST),
https://twitter.com/PoorlyAgedStuff/status/1266461005858643977/photo/1).
[3] Evan Perez and Jason Hoffman, *Trump tweets Antifa will be labeled a terrorist organization but experts believe that's unconstitutional*, CNN, May 31, 2020.

all representing language that is widely thought to prompt extremist responses, particularly white supremacist extremism.[4] It is within this hostile political climate which Mr. King exists.

8.      In totality, the years of conduct of the Defendants against Mr. King constitute a degree of severe abuse, injury, indifference, and deprivation that do not pass constitutional or statutory muster. And so it is that Mr. King calls upon the Courts of "this country" to redress severe violations of his rights under the U.S. Constitution and all relevant laws.

## II.      JURISDICTION, VENUE, AND ADMINISTRATIVE EXHAUSTION

9.      The instant civil rights actions arise from the conspiratorial deliberate indifference, torture, and deprivations of Mr. King's constitutional rights by the Defendants, commencing first with Mr. King's grievance filed approximately on and or around December 17, 2017, continuing and culminating with various unlawful acts perpetrated by Defendants from then to the present. Ex. 2: Partial Administrative Remedy List dated November 2, 2020.

10.      As such, Mr. King sues Defendant United States pursuant to the Federal Torts Claims Act (hereinafter "FTCA") and Defendant Bureau of Prisons under the Administrative Procedure Act (hereinafter "APA"). Mr. King sues the individual named Defendants and currently unknown/unidentified federal agents and employees of the United States and the BOP under both the FTCA and *Bivens v. Six Unnamed Agents of the Federal Bureau of Investigations*, 403 U.S. 388 (1971), and respective jurisprudence.

11.      Accordingly, per *Bivens,* Mr. King brings the instant action against the United States, the Bureau of Prisons; agents, servants, and employees of the BOP, FCI Florence, USP

---

[4] Hate Watch Staff, *Trump Tweets 'When the Looting Starts, the Shooting Starts,' Extremists Will Respond,* SOUTHERN POVERTY LAW CENTER, May 31, 2020.

Florence, FCI Englewood, and USP Leavenworth; and other governmental agents, servants, and employees acting within the scope of their agency and employment under the First and Eighth Amendments to the United States Constitution.

12.     On February 23, 2021, Mr. King filed a tort claim notice under the FTCA using standard Form 95. To date, there has been no response. As six months have expired without a response, his claim is therefore constructively denied. 28 U.S. § 2675(a).

14.     This court holds jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1346(b), and 5 U.S. § 551 et seq (APA).

15.     Pursuant to 28 U.S. § 1391, venue is proper in the District of Colorado (hereinafter "District") because the overwhelming majority of the acts and omissions alleged herein occurred in the District.

**A.     Exhaustion of Administrative Remedies**

16.     Mr. King has and continues to attempt to resolve numerous complaints through the grievance process established by each prison, exhausting all possible administrative appeals as set forth under 28 C.F.R. §§ 542.19 and Administrative Remedy Program, Program Statement 1330.18 and thus now brings this action for relief pursuant to 42 U.S.C. § 1997e(a).

17.     Mr. King is not in possession of complete files from his grievances, however, attaches hereto the documents he has received thus far. Ex. 2.

**B.      Timeliness**

18.     Mr. King's claims are all timely asserted and the instant *Fourth Amended Complaint* includes amendments asserting claims arising out of the conduct, transaction, or occurrence set out—or attempted to be set out—in his original pleading. Fed. R. Civ. P. 15(c)(1)(B).

19.     Under the Continuing Violation Doctrine, the statute of limitations does not run until the occurrence of the last violation, thus the statute of limitations in the instant action, running on the date of the last constitutional violation, which upon information and belief, continues to Present. Accordingly, Mr. King's claims are timely asserted as they sufficiently relate to and arise from the same underlying conduct by the Defendants and are therefore asserted under the Continuing Violation Doctrine.

## C.     Unavailability

20.     In the alternative, pursuant to 42 U.S.C. §§ 1997e(a), the statute of limitations on Plaintiff's claims relate to the August 17, 2018 assault by Defendants, is therefore equitably tolled by the delays of administrative exhaustion caused *entirely* by the BOP. Indeed, the Defendants continually "prevent, thwart, or hinder" Mr. King's efforts to avail himself of an administrative remedy, thus rendering that remedy 'unavailable' therefore the court should excuse the prisoner's failure to exhaust." *Gray v. Sorrels*, No. 19-7060 (10th Cir. 2020) citing *Little v. Jones*, 607 F.3d 1250 (10th Cir. 2020).

21.     Further, the statute of limitations on Plaintiff's claims relating to all subsequent assaults has not yet run.

## III.   PARTIES

## A.     MR. ERIC KING

22.      Mr. King was raised by a single mother in a working-class family in Kansas City, Missouri. As a child, his mother cleaned office buildings at night. Mr. King would pack snacks

and toys in a bag and accompany her to work. As a young person, Mr. King's stepfather died of cancer. Mr. King held his hand as he died. Mr. King was very active in the Boy Scouts and loved to visit the Nelson Atkins Museum.

23.     Mr. King was politicized at the age of 15 after witnessing an eviction. Watching and experiencing wealth inequality captivated Mr. King's attention and compelled him to get involved in community activism. This included advocacy and providing free daycare to working mothers in his community.  Mr. King prepared and served free vegan meals to the community, supported Two Spirit, Lesbian, Gay, Bisexual, Transgender, Queer, Intersex, Asexual (2SLGBTQIA) community members facing violence; and opposed the rise of white supremacist groups in the Midwest. Mr. King is dedicated to honoring the inherent value in people, animals, and the Earth. Prior to his incarceration, Mr. King was unhoused, choosing to prioritize participation in his community over personal comfort.

24.     Throughout Mr. King's life, his brother struggled with significant substance use issues and cycled in and out of incarceration. At one point, Mr. King's brother attempted to rob Mr. King and shoot him. He was ultimately arrested. Mr. King, dedicated to community justice, refused to engage in the prosecution of his brother. Though Mr. King remained estranged from his brother when he died, Mr. King's family recalls this as an example of Mr. King's dedication to community justice. Mr. King witnessed the results of racial segregation, redlining, gentrification, blockbusting, and racially biased policing in his community.

25.     After watching the police killing of unarmed Michael Brown on the streets of Ferguson, Missouri, Mr. King was moved to act. He was devastated to see white officers shoot an unarmed Black man and leave his body in the street as if he were rubbish. As a 28-year-old

white man, Mr. King felt there was a need to do something urgent in order to stop police violence against Black people. Eric immersed himself in the uprisings in Ferguson. Ultimately, his participation led to him throwing two unlit incendiary devices into an empty building. Despite the fact Mr. King's offense involved no victims, he faced significant charges and ultimately accepted a non-cooperating plea agreement to ten years in Federal Prison. Ex. 1.

26.      Throughout Mr. King's incarceration he has been deprived of phone calls, visits, mail, and other methods of communication. Despite these barriers, Mr. King has maintained a caring and involved relationship with his wife as she has navigated multiple significant health events.

27.      Throughout his time in prison, Mr. King has remained dedicated to his religious beliefs, meditation, mindfulness, scholarship, and yoga practice.

28.      Mr. King is a dedicated father to his two step-children, who he has mostly known under conditions of incarceration. Though he has very limited communications with the children, Mr. King has remained an active, caring, and dedicated father.

29.      Mr. King is known by the people who love him for his sense of humor, introspection, and dedication to the wellbeing of others.

29.      Despite unspeakable cruelty, Mr. King continues to engage in self-improvement, strengthen his familial relationships, participate in recreation, engage in his faith, and gain new life skills. Mr. King is deeply passionate about playing Scrabble, enjoying art, musical theater, soccer, and reading. He is deeply moved by creative work and has become a profound poet over the period of his incarceration. His creative work has allowed his community outside to understand the struggles incarcerated people experience.

**B.      DEFENDANTS**

### 1.  DEFENDANT BUREAU OF PRISONS

30.     Defendants United States and the Federal Bureau of Prisons (BOP) operated, at all relevant times, correctional, detention and imprisonment institutions throughout the United States, including the Federal Correctional Institution at Englewood, Colorado ("FCI Englewood"); the Federal Correctional Complex at Florence, Colorado, which includes the Federal Correctional Institution Florence ("FCI Florence"); the United States Penitentiary at Florence, Colorado ("USP Florence"), and the United States Administrative Maximum Facility ("ADX Florence"); the United States Penitentiary at Leavenworth, Kansas ("USP Leavenworth"); the United States Penitentiary at McCreary, Kentucky ("USP McCreary"); and the United States Penitentiary at Lee, Virginia ("USP Lee"); as well as the Federal Transfer Center through which federal prisoners are transported to USP Lee, where the relevant incidents occurred. All aforementioned facilities are federal detention and/or transfer facilities, which hold male prisoners. These facilities are operated by the BOP, a division of the United States Department of Justice, which is itself an agency of Defendant United States.

31.     The following Defendants (hereafter "Warden Defendants") were employed as Wardens or Associate Wardens at all times relevant to the complaint, either at FCI Florence or FCI Englewood (as further explained herein): Cathy Goetz, Darrell Keith (D.K.) Lennon, John F. Williams, Erlinda Hernandez, Tonya Hawkins, David Christensen, Bradley Greilick, and Andre Matevousian. A Warden is the chief executive officer of the facility, and is responsible for the total operation of the facility. All employees of the Bureau of Prisons who handle discipline are "the direct subordinates of the warden who reviews their decision." Cleavinger v. Saxner, 474 U.S. 193, 204, 106 S. Ct. 496, 502 (1985). The Warden delegates responsibility to executive staff and department heads who assist the Warden in managing the institution. Assistant Wardens act in a supervisory capacity and delegate responsibility to other employees.

The Warden Defendants are sued in their individual capacities.

## 2. FCC FLORENCE DEFENDANTS

32.     The following Defendants (hereafter "FCI Florence Defendants") are or were correctional officers or employees employed by the United States Bureau of Prisons in the State of Colorado at all times relevant to the complaint, either at FCI Florence or USP Florence, and were acting within the scope of their duties as agents, servants, and employees of the BOP and under color of federal law: Donald Wilcox; Captain Robert Giconi; Lieutenant Jeffrey Kammrad; Kevin Carroll; Richard White; Alfred Garduno; Terra Brink (now Terra Maine); Lieutenant Michelle Abraham; Lieutenant Leann Reynolds; Lieutenant Mark Melvin; Lieutenant Robert Cordova; Jason Wilcox; nurse Ronald Batouche; and nurse Loreena Fraboni. They are sued in their individual capacities.

33.     On information and belief, as described herein the above-listed Florence Defendants conspired to harm Mr. King and to interfere with the exercise of his rights. As overt acts in furtherance of this conspiracy, the Florence Defendant committed assault, battery, false imprisonment torture, and/or enabled and/or failed to prevent depredations against Mr. King, and took other actions described herein. They are sued in their individual capacities.

34.     On information and belief, as described herein, defendants Batouche and Fraboni were employed by BOP as nurses and observed and checked Mr. King during the four-point restraints. Defendant Nurses Fraboni and Batouche knew of the conspiracy to harm Mr. King and interfere with exercise of his rights, but took no action to provide him with appropriate care for serious medical needs, nor to intervene in the four-point restraint process.

35.     Defendant Andre Matevousian is the former Florence Complex Warden in August 2018. He was subsequently promoted to regional director for the North Central region. As Warden and now regional director, Defendant Andre Matevousian had a duty to protect and knowledge of unlawful conspiracy aimed at interfering with Mr. King's rights.

36.     Defendant Special Investigative Services (SIS) Lieutenant Robert Cordova was employed by the Bureau of Prisons at FCI Florence where he investigated Mr. King and oversaw collection and preservation of evidence following the August 17, 2018 incident with Defendant Donald Wilcox.

37.     Defendants Nicole English and Lieutenant Jared Herbig are or were at all times relevant to the complaint employees of USP Leavenworth (hereafter, USP Leavenworth Defendants). Defendant English was the Warden of USP Leavenworth at all relevant times to the complaint. The Warden delegates responsibility to executive staff and department heads who assist the Warden in managing the institution. As Warden, Defendant English was responsible for denying Plaintiff his phone privileges and ordering/maintaining Plaintiff to solitary confinement in the "Special Housing Unit" (SHU); and when she did so she was acting within the scope of her duties as an agent, servant, and employee of the BOP and under color of federal law. Defendant Herbig assisted Warden English in carrying out these actions. They are sued in their individual capacities.

**3.     FCI ENGLEWOOD DEFENDANTS**

38.     The following Defendants (hereafter "FCI Englewood Defendants") were or are, at all times relevant to the complaint, correctional officers or employees employed by the United States Bureau of Prisons in the State of Colorado, at FCI Englewood: Lieutenant Starcher,

12

Captain Sapp, Lieutenant Quezada, Dustin Gustafson, Lieutenant David Humphries. Defendant Gustafson assaulted plaintiff, as alleged herein. On information and belief, these individuals and John Doe FCI Englewood Defendants conspired to harm Mr. King and to interfere with the exercise of his rights. As overt acts in furtherance of this conspiracy, the Defendants committed assault, battery, harassment, and/or enabled and/or failed to prevent depredations against Mr. King, and took other actions described herein. They are sued in their individual capacities.

39.     Defendant Lieutenant David Humphries was employed by the Bureau of Prisons at FCI Englewood where he acted as Mr. King's Counselor from the dates of October 2019-March 2022 and as such was directly charged with Mr. King's care and supervision. On information and belief, Defendant Humphries formerly worked at the FCC Florence compound and knows/maintains relationships with Florence Defendants named herein and their associates.

40.     Defendant Dustin Gustafson was employed by the Bureau of Prisons at FCI Englewood where he worked in the SHU and had immediate physical custody and control of Mr. King.

### 4.  DEFENDANT JOHN DOES

42. Plaintiff is ignorant of the true names and capacities of the other agents and employees of the United States and the United States Marshal Service ("USMS") who are sued herein as Defendant John Does #16-20. On information and belief, Defendant John Does #16-20 are employees of the are employees of the USMS, a bureau of the United States Department of Justice, operating under the direction of the Attorney General. One of the responsibilities of the USMS is the supervision, housing, placement and court appearance of pretrial prisoners in the custody of the BOP and various other pretrial detention facilities.

44.     Plaintiff is likewise ignorant of the true names and capacities of the other agents and employees of the United States and the BOP who are sued herein as FCI Florence Does, USP Leavenworth Does, and FCI Englewood Does. Plaintiff also sues herein Doe Segregation Review Officials (SRO) for USP Leavenworth and FCI Englewood, specifically for failing to provide any review of Plaintiffs confinement in the SHU, in violation of Plaintiff's procedural due process rights.  Plaintiff is informed and believes and thereon alleges that each of said fictitiously named Defendants is responsible in some manner for the actions and damages alleged herein. Plaintiff is furthermore informed and believes and thereon alleges that each of said fictitiously named Defendants was the agent, servant, and employee of Defendant United States and/or its agent BOP, and was acting within the scope and course of his or her agency and employment and with the BOP.

## III.    STATEMENT OF FACTS

## A.    BACKGROUND: ENGLEWOOD BIAS-MOTIVATED RETALIATION AND FALSEHOODS (2016-2017)

45.     The details of Mr. King's 2014 underlying offense involved damage to property but no indication of animosity or aggression towards human beings; notably Mr. King performed this act of protest in the middle of the night intending that the building be unoccupied so as not to endanger anyone. [Sentencing transcript.] Sentencing proceedings reflect the fact that Mr. King also had no prior convictions, and was thus classified as Criminal History Category I per the Federal Sentencing Guidelines. Ex. 1, p 2. The Honorable Gary Fenner of the Western District of Missouri imposed the mandatory sentence of ten years as required by statute, noting that the mandatory minimum overrode any guidelines recommendation. *Id*.

46.     Concomitant with his PSI and history of nonviolence (including the nonviolent underlying offense), in August 2016 Mr. King began serving his sentence at FCI Englewood, a low-security facility operated by the Bureau of Prisons.

47.     Soon after Mr. King's transfer into the Bureau of Prisons custody, BOP staff began unlawfully targeting and retaliating against Mr. King based on his Wiccan and antiracist beliefs, associations, and statements. In December 2016 Mr. King submitted a complaint at FCI Englewood regarding Staff Misconduct and Unprofessionalism during a meeting with his wife and children. Ex. 2. Within a week of submission of this complaint, FCI Englewood staff seized and read through Mr. King's private diary, then viewed the contents of his diary and poetry posted online written by Mr. King as evidence of the violation. Exhibit 3: FCI Englewood January 2017 Disciplinary packet.

Support Eric King » "If Tamir was named Andy from the Hamptons" a poem by Eric King     Page 2 of 3

Police keeping cities safe

passing out freedom bullets

Black bodies not regarded as anything

more than click-bait and hot topics

If Tamir was named Andy

from the Hamptons

maybe it'd make a fucking difference?!

This isn't gang violence, its state violence

its race violence, it shouldn't exist but

so often does happen without outrage

from the privileged to well off

to be outspoken

This isn't new it's just finally on the news

cause people took to the streets

& when told to disperse they refused

So painful but its true

Blue Lives Murder

*See* "If Tamir was Named Andy from the Hamptons," by Eric King, found at Ex. 3 p. 13.

48.     Despite the unconstitutional invasion of basic privacy involved with imposing sanctions on Mr. King for the contents of his diary and without regard for the wholly expressive nature of the "threatening" content, FCI Englewood staff filed a disciplinary report against Mr. King for "Conduct Disruptive to Security or Orderly Running of BOP Facility - Most like threatening another with Bodily Harm" and requested that Mr. King be immediately transferred to FCI Florence on January 6, 2017. Over his protestations, Mr. King was found guilty of committing a prohibited act and sanctioned to loss of twenty-seven days of good time credit and sixty-day loss of commissary, phone, and visiting privileges. Ex. 3, p 3.

49.     Mr. King made the best of housing placement at FCI Florence: he taught yoga and poetry to other prisoners, enjoyed regular visits with his wife and family, and incurred no further disciplinary infractions, evening earning a poetry certificate. Exhibit 4: Poetry Certificate. Mr. King did, however, file complaints against Florence staff for restricting his rights as a Wiccan, including refusal to provide him with vegan meals. Ex. B, p 1.

50.     Mr. King's sincerely held religious affinity is witchcraft, a practice that is devoted to forming egalitarian relationships between people, planet, and animals. In accordance with this religious practice, Mr. King observes a vegan religious diet that consists only of plant-based foods. Mr. King abstains from consuming animal flesh, fish, milk, cheese, butter, eggs, and other products derived from animals. Additionally, it is improper for vegans to eat food items that have been touching animal products, as the flavor and particles can contaminate otherwise vegan food items.

51.     During holidays and lockdowns at FCI Englewood, the prison served brown bag dinners consisting of a cheese and bologna sandwich for meals. On multiple occasions Mr. King requested a peanut butter sandwich, a reasonable request adhering to his religious diet. Instead, Mr. King was told "your vegan option is taking the meat off of your sandwich," leaving him nothing but bread that has been touching forbidden food items.

52.     Witch and magical practices emphasize the relationship between beings. As such, ceremony and ritual are performed in collective settings. Additionally, the religious practice of magic requires texts and items not readily available to Mr. King in his cell–such as items from nature and real or artificial candles. Mr. King has spent much of his incarceration in the Secure Housing Unit ("SHU") or segregation. At FCI Englewood and now at ADX, Mr. King has been denied access to group religious activities including participating in a group of incarcerated individuals who practice his faith.

53.     Prior to August 17, 2018, Mr. King known as an open anti-racist who breached the BOP's *de facto* racial code to teach interracial yoga and poetry classes, while writing damning expose and poetry on official and medical misconduct at Florence. *See* "It's Going Down! Medical Horrors at FCI Florence," https://itsgoingdown.org/medical-horrors-fci-florence/ , last visited February 20, 2023.

54.     Mr. King asserts that the abuse described herein and the current cruel and truly unusual conditions of his confinement for an of property destruction demonstrate that the Defendants have conspired against Mr. King, an anti-racist antifascist anarchist Wiccan committed to acting in solidarity with Black people, to deprive him of equal protection of the laws, and of equal privileges and immunities under the laws; The defendants committed overt acts in

17

furtherance of the conspiracy, including but not limited to acts of assault, battery, harassment, housing transfer, and other acts of abuse; whereby Mr. King was injured in his person and his property, maliciously prosecuted, and is currently deprived of rights and privileges of a citizen of the United States, as he is now serving an unnecessarily and unlawfully prolonged sentence at the Florence ADX Supermax.

**B.    CONSPIRATORIAL CRUEL AND UNUSUAL PUNISHMENT: TORTURE & DELIBERATE INDIFFERENCE AT FCI FLORENCE (2018) BOP GOVERNING PROGRAM STATEMENT REGARDING FOUR-POINT RESTRAINT**

55.    On August 17, 2018, while at FCI Florence, a compliant Mr. King was unnecessarily placed in Four-Point restraints and a Stryker chair as punishment due to Defendants' deliberate, premeditated, pretextual, conspiratorial and retaliatory motivations. This course of conduct demonstrates behavior outside the bounds of the BOP's own regulations nor is it condoned by the mandates of the U.S. Constitution and relevant statutes.

56.    The use of restraints is governed by U.S. Department of Justice, Bureau of Prisons, Program Statement P5566.06 (hereinafter 'Restraint Program Statement'). Upon information, all BOP employees, staff, agents, and/or contractors know and/or should know the requirements of BOP Program Statements, particularly with respect to treatment of prisoners and protocol.

57.    §552.24 of the Restraint Program Statement provides as follows:

"[USE OF FOUR-POINT RESTRAINTS §552.24. When the Warden determines that four-point restraints are the only means available to obtain and maintain control over an inmate, the following procedures must be followed:

a. Soft restraints (e.g., vinyl) must be used to restrain an inmate, unless:

(1) Such restraints previously have proven ineffective with respect to that inmate, or

(2) Such restraints are proven ineffective during the initial application procedure.] This may not be delegated below the Warden's level.

b. Inmates will be dressed in clothing appropriate to the temperature.

c. Beds will be covered with a mattress, and a blanket/sheet will be provided to the inmate.

***<u>Under no circumstance</u> shall an inmate be allowed to remain naked or without bed covering placed over the inmate's body unless determined necessary by qualified health personnel.***

d. Staff shall check the inmate at least every fifteen minutes, both to ensure that the restraints are not hampering circulation and for the general welfare of the inmate. When an inmate is restrained to a bed, staff shall periodically rotate the inmate's position to avoid soreness or stiffness.

Qualified health personnel shall evaluate the inmate to be restrained to a bed to determine the position the inmate should be placed in. When qualified health personnel are not immediately available, the inmate shall be placed in a "face-up" position until evaluated by qualified health personnel. ***Inmates must be checked every 15 minutes and this information shall be documented. Inmates will be checked every 15 minutes and this information must be documented.*** *See* Section 14.b., Use of Restraints Reporting Requirements for detailed information on documenting 15 minute checks.

e. A review of the inmate's placement in four-point restraints shall be made by a Lieutenant every two hours to determine if the use of restraints has had the required

calming effect and so that the inmate may be released from these restraints (completely or to lesser restraints) as soon as possible. ***At every two-hour review, the inmate will be afforded the opportunity to use the toilet, unless the inmate is continuing to actively resist or becomes violent while being released from the restraints for this purpose.***

Based on the particular nature of the situation, the Lieutenant who has offered the inmate a bathroom break will determine how many staff are needed to release the inmate from restraints and provide the inmate a bathroom break. The Lieutenant will assemble the staff and visually observe and direct staff as they complete this task. The Lieutenant will determine what protective equipment is needed, if any, for the staff assisting with the inmates bathroom break. The goal of the two-hour reviews is to determine, as soon as possible, that the inmate has regained self-control and may be placed in lesser restraints. See Section 9, Progressive and Ambulatory Restraints. ***Staff should look for a pattern of non-disruptive behavior over a period of time indicating the inmate has regained self-control and is no longer a disruptive threat. Additionally, the 15 minute and two-hour check logs must be reviewed to support any decision for lesser measures or the removal of restraints.*** Inmates asleep at the time of the two hour reviews should be awakened to assess their condition. If an inmate is released temporarily from four-point restraints for any reason, e.g., to use the toilet, consumption of food or beverage, etc., without continuing disruptive or aggressive behavior, the Lieutenant must consider authorizing lesser restraints or removing the restraints. See Section 9, Progressive and Ambulatory Restraints. ***If an inmate is returned to four-point restraints after a non-disruptive break, the Lieutenant must document the reasons for the action.*** Ordinarily, the Operations

Lieutenant makes the decision to release an inmate or apply lesser restraints. This authority must not be delegated below the Lieutenant level. If the Lieutenant needs to consult with mental health staff before making the decision on whether to release an inmate from restraints, it will be sought without delay. [f. When the inmate is placed in four-point restraints, qualified health personnel shall initially assess the inmate to ensure appropriate breathing and response (physical or verbal). Staff shall also ensure that the restraints have not restricted or impaired the inmate's circulation. When inmates are so restrained, qualified health personnel ordinarily are to visit the inmate at least twice during each eight-hour shift. Use of four-point restraints beyond eight hours requires the supervision of qualified health personnel. Mental health and qualified health personnel may be asked for advice regarding the appropriate time for removal of the restraints.] *Health Services staff, perform initial and subsequent required checks, must examine and document the following:*

- Date and time of examination;

- Examining staff member;

- Body position;

- Restraints (adequate circulation);

- Vital signs (blood pressure, pulse, respiration, and temperature);

- Medication;

- Injuries;

- The inmate's intake, output, hydration, etc.;

- Possible medical reasons for behavior;

- Deterioration of inmate's health; and

- Any other significant findings and comments.

In institutions without 24-hour medical coverage, medical staff must report to the institution twice during each eight-hour shift that an inmate remains in four-point restraints. Such staff will be compensated (overtime, compensatory hire, etc.) in accordance with the regulations. Under no circumstances will non-medical staff perform a medical assessment of an inmate. Psychology Services staff will examine inmates in four-point restraints at least once during every 24 hour period that the inmate is restrained. Psychology staff examinations will include the following:

> (1) A review of the inmate's psychological history;

> (2) A description of the interview conducted with the inmate;

> (3) A review of the 15 minute, two-hour, and health services review logs;

> (4) A description of the inmate's current mental health status;

> (5) Recommendations; and

> (6) Whether the inmate is being referred for mental health institution placement and an explanation.

*See* Section 14.b., Use of Restraints Reporting Requirements, for detailed information on documenting Health and Psychology Services Staff reviews. U.S. Department of Justice, Bureau of Prisons, Program Statement P5566.06, §552.24, https://www.bop.gov/policy/progstat/5566_006.pdf (last visited February 19, 2023), emphasis added.

58.    Upon information and belief, there is no BOP Program Statement with respect to the use of the Stryker chair - nor a protocol set forth concerning its use- and yet it is still utilized despite failing to establish any meaningful notice or process to challenge its use.

## 2. DELIBERATE AND PREMEDITATED CRUEL & UNUSUAL PUNISHMENT: THE AUGUST 17, 2018, TORTURE OF MR. KING BY DEFENDANTS

*"You [I] can't breathe."*
*U.S. v. Eric King, 19-cr-257-WJM, Eric King-Direct Examination, October 15, 2021;*
*Eric Garner, July 17, 2014, one month before the August 2014, Ferguson Missouri*
*Uprisings.*

59.      August 17, 2018 Defendants subjected Mr. King to a prolonged period of deliberate and premeditated torture at FCI Florence, using an email from Mr. King to his wife as pretext for hours of physical abuse and unlawful, humiliating restraint.

60.      Defendant Cordova  and other FCI Florence Special Investigative Services ("SIS") personnel closely monitor electronic mail communications (hereinafter "e-mail") made to and from prisoners housed at the prison. FCI Florence SIS Officers and Defendant Donald Wilcox agreed that Wilcox would "take care of" interviewing Mr. King about an email written to Mr. King's wife.

61.      On approximately August 17, 2018, officers ordered Mr. King to go to the lieutenants' office at FCI Florence for questioning. Not informed of the specific reason for the questioning, Mr. King suspected that the meeting was related to an email he sent to his wife earlier that day.

62.      Upon Mr. King's arrival at the lieutenants' office, he was made to wait outside. Defendant Wilcox then emerged from the lieutenant's office, approaching Mr. King with Defendant Kammrad.

63.      Defendant Wilcox is known as a bully, having harassed Mr. King in the past. Mr. King's fears were then compounded when after someone asked Defendant Wilcox if he needed

assistance, to which, Defendant Wilcox replied with a deliberately premeditated, and onerous statement: "No, you don't want to see this."

64.    Defendant Wilcox and Defendant Kammrad ordered Mr. King to a utility closet, full of cleaning products and supplies, for further questioning. From other prisoners, Mr. King knew there were two rooms to which lieutenants frequently transported prisoners for questions: (1) a small office; (2) the other functioned as a utility closet and/or storage room, appointed with lockers, brooms, and other maintenance items - most conveniently with no cameras nearby. Keenly aware that the small office is utilized for legitimate investigatory questioning, Mr. King knew that the unmonitored utility closet , without video surveillance, is used when officers intend to harass, intimidate, or attack prisoners. As Defendant Wilcox ordered Mr. King to the unmonitored utility closet, Mr. King knew harm by Defendant Wilcox was imminent.

65.    Defendants Wilcox and Kammrad forced Mr. King into the unmonitored utility closet, immediately backing him into a corner. Defendant Wilcox began screaming and cursing at Mr. King. Present during this abuse, Defendant Kammrad, stood by doing nothing to prevent or intervene in this harassing behavior.

66.    Defendant Wilcox then ordered Defendant Kammrad to leave. Obeying the order, Defendant Kammrad exited the unmonitored utility closet, leaving Mr. King to fear for his physical safety and life.

67.    Immediately upon Defendant Kammrad leaving, Defendant Wilcox moving closer to Mr. King, pressing his chest up against Mr. King's. In an effort to deescalate the encounter, Mr. King took several steps backward to avoid physical contact with Defendant Wilcox.

24

Defendant Wilcox, far larger in physical size than Mr. King, resumed cursing, threatening - calling Mr. King a "terrorist." The Verge, *The White House is answering online petitions again, but does it still matter?,* August 2018, https://www.theverge.com/2018/3/20/17143536/white-house-we-the-people-online-petition-answers-back (last visited February 19, 2023, citing a petition to "designate the anti-fascist "antifa" movement a domestic terrorist organization").; See generally S.Res.279 and H.Res.272- A resolution calling for the designation of Antifa as a domestic terrorist organization.

68.     Mr. King, fearing for his safety, remained outwardly calm and compliant. However, subjectively, Mr. King feared for his life during the entire encounter.

69.     Not satisfied with verbal insults and threats, Defendant Wilcox began to torture Mr. King, shoving Mr. King, causing him to fall back and hit a wall, punching him twice in the face, causing bruising, swelling, significant pain, and a black eye. Four days following the torture, Mr. King's injuries were still visible.

70.     Returning to the unmonitored utility closet, Defendant Kammrad found Mr. King submissive with his hands placed behind his head. Despite his compliance, Defendants Kammrad and Wilcox threw Mr. King to the ground.

71.     Shortly thereafter five more BOP employees joined in the torture of Mr. King. Defendants White, Lieutenant Reynolds, Brink (now Maine), Garduno, and Carroll arrived, holding a compliant Mr. King down in order to further assault him.

72.     Defendants Kammrad, White, and/or both handcuffed Mr. King while he was compliant and lying face down.

73.     Defendant Brink (now Maine), engaged Mr. King, placing leg restraints on him.

74.     Defendants Captain Giconi, who would later torture Mr. King while in four-point restraints, ordered the other BOP employees to take Mr. King to the ground outside. This order was executed by Defendants Garduno, Lieutenant Reynolds, and/or Kammrad.

75.     Defendant Giconi then requested a Stryker chair.

76.     Defendant Kammrad supervised Mr. King's transfer from the ground to the Stryker chair. Defendants Giconi, Carroll, Garduno, and White strap Mr. King to the chair. Use of the Stryker chair is not contemplated by policy concerning use of force and applications of restraint within the BOP. *See* 28 C.F.R. §522.20.

77.     Defendant Kammrad then ordered Mr. King's transfer to the SHU despite being involved in the immediate use of force against Mr. King.

78.     Terrified, Mr. King in no manner physically or verbally resisted the Defendants, "sitting there staring like a zombie." Not wanting to move, not wanting to resist for fear the Defendants will throw the chair down with him restrained and affixed to the chair.  *U.S. v. Eric King*, 19-cr-257-WJM, Eric King-Direct Examination, October 15, 2021.

79.     Defendants then wheeled Mr. King, in the Stryker chair, to a segregation cell.

### 3. GOING MEDIEVAL: FOUR-POINT RESTRAINT AS CRUEL & UNUSUAL PUNISHMENT

80.    In the segregation cell Defendant Kammrad placed Mr. King in the four-point restraints, though he held the authority to release Mr. King from the restraints upon compliance.


81.    Inconsistent with the BOP's own Program Statement regarding the use of four-point restraints, Defendants Kammrad, Carroll, Melvin, Abraham, Garduno, and White participated in placing and maintaining the hard four-point restraints as punitive retaliation, to inflict further pain, cruel and unusual punishment upon Mr. King - without absolutely no penological interest in doing so.


82.    Indeed, like a scene from a medieval narrative, while in the four-point restraints Mr. King experienced excruciating pain. Describing the restraint in detail, he said: "It's a very dramatic process, because you're handcuffed behind your back, pushed forward, and so they stretch your legs out to make sure they can come up your ankles, and then they pull you back and stretch you like a Garet. It is not a casual stretch. Within two minutes of this happening, my limbs are on fire. My back is hurting. My neck is hurting. My head is hurting. **You can't breathe**." *U.S. v. Eric King*, 19-cr-257-WJM, Eric King-Direct Examination, October 15, 2021, emphasis added.


83.    Also, despite Mr. King's absolute compliance and again inconsistent with the BOP's own Program Statement regarding the use of four-point restraints with respect to clothing and covering, the Defendants strip Mr. King naked of his clothing with a metal hook. Mr. King, later describes this process, likening it to rape: "I'm being absolutely compliant. And they have these guards on me, but they don't cut off your clothes. Like, they have to remove your clothes, and **you're shackled, but they don't cut them off. They use a hook**. And I feel like a rape

27

victim. I am pressed against the wall with two grown men holding on each side, and a third one comes with **a metal hook and rips my clothes off. Bare naked.** And you can't resist. You can't. You're docile." *U.S. v. Eric King*, 19-cr-257-WJM, Eric King-Direct Examination, October 15, 2021, emphasis added.

84.    According to 28 C.F.R. 552.20-27, and 29 C.F.R. 1910, the use of four-point restraints is solely for the purpose of restraining and calming an out-of-control prisoner. Yet despite his compliance, from the time of the encounter in the utility and/or storage closet, Defendants held Mr. King in this prone position for six hours **without water or access to the bathroom, causing him to urinate on himself twice - also in contravention of the governing rules.**

85.    Further, the Warden of a BOP facility is the only person holding the authority to allow continuation of restraints. The Warden knew of Mr. King's restraints after 15 minutes but **did not** initially authorize the decision to place Mr. King in four -point restraints - also in contravention of the governing rules. Rather, hard-point restraints were ordered by Defendant Kammrad, who was not the Warden nor the acting Warden at the time.

86.    The following defendants were serving as wardens and/or acting wardens at the time of the restraints:

- o Defendant Goetz, Warden, FCI Florence.
- o Defendant Lennon, Acting Warden, FCI Florence
- o John F. Williams, Warden, FCI Englewood.
- o Erlinda Hernandez, Associate Warden, FCI Florence.
- o Tonya Hawkins, Assoc. Warden, FCI Florence
- o David Christensen, Associate Warden

       o    Andre Matevousian, Warden, Florence Correctional Complex and ADX

87.     Defendants utilized four-point restraints solely as a retaliatory, humiliating, and punitive measure against Mr. King, leaving him nearly naked without a blanket in violation of the governing rules, procedures, and protocols as set forth in the regulations.

88.     Defendant Giconi and Valle, began to verbally abuse Mr. King, telling him that he was **due "street justice," stating: "we're going to fuck you up. You know we're going to get you raped, right? You know we can do that."** *U.S. v. Eric King*, 19-cr-257-WJM, Eric King-Direct Examination, October 15, 2021. In fact, *just days* following the threats by Defendant Giconi and Valle, Mr. King was assaulted by known violent prisoners shortly after being transferred to USP Leavenworth.

89.     Not satisfied with Mr. King's compromised position shackled to the four-point restraint, during the first hour in the hard four-point restraints, Defendant Giconi verbally and physically tortured Mr. King. Benjamin Valle, who upon information and belief is now deceased, first approached Mr. King, compliant, helpless, and defenseless, restricting Mr. King's breathing with his hand for at least a minute. Simultaneously, Defendant Giconi, laughing at Mr. King's terror, walked up next to Benjamin Valle, approached Mr. King with a shield, replaced Benjamin Valle's hand with the shield, pushed it on Mr. King's face and body informing Mr. King that the suffocation was for spitting on his staff. Mr. King did **not** spit on any BOP employee, nor anyone else.

90.     Defendant Giconi then pushes the shield so hard, entirely **restricting Mr. King's breathing, leaving the shield object upon Mr. King for fifteen minutes**. Following this,

Defendant Giconi, placed a sign on the door instructing no further communication with the "inmate," leaving Mr. King alone. *U.S. v. Eric King*, 19-cr-257-WJM, Eric King-Direct Examination, October 15, 2021.

91.     Mr. King describes his torture and nearly seven hours in restraints, which are specifically in violation of the relevant BOP regulations: "During that entire time, all five hours, I was never once asked would you like to use the bathroom? Would you like some water? I would have clearly said 'yes' over urinating all over myself. No one chooses to humiliate themselves. No one makes that choice…[the urination] occurred twice. **And I just felt so stupid and humiliated**." *U.S. v. Eric King*, 19-cr-257-WJM, Eric King-Direct Examination, October 15, 2021.



92.     As required by BOP policy, BOP had a camera filming Mr. King while he was in the four-point restraint. However, knowing the unlawful nature of their conduct, there is a significant gap in the video footage, and some FCI Florence Doe Defendants appear to have removed footage of the assaults by Valle and Defendant Giconi from the video footage. Alternatively, the Defendants still violated BOP policy by failing to record the assaults. In fact, discovery during the criminal case indicates that the BOP spoliated relevant evidence,

misplacing, destroying, and/or potentially forged other materials related to the August 17, 2018 incident.

93.     Following the removal of restraints after nearly eight hours, Mr. King was transferred without authorization to USP Florence and held incommunicado in the SHU from late on August 17, 2018, until he was interrogated on August 20, 2018. The conditions of the USP Florence SHU were themselves deplorable: Mr. King was deprived of a mattress, writing utensils, or even a working toilet. At one point during this *incommunicado* period ,Defendant USP Florence Compound Officer Jason Wilcox stood silently outside of Mr. King's cell. About this encounter, Mr. King reported that:

> "That is so scary. These guys are militant together. They are -- they stick together. And I can't blame them, but that's how it is. And if he thinks I just assaulted his father? Good Lord. He could open my door at any time, any time, and let another dude in there, let an orderly in there with a knife. That stuff happens at penitentiaries. He could let himself in there and say that I threw poop at him, spray me, and then stomp my head into the ground. This happens, and I know it happens, and it gives me panic attacks still today even talking about this, because they could have killed me. And my mindset at that time is if I make the wrong move here in any way, these officers are going to get what they want, which is me dead, because they think I hurt them. They don't like that." *U.S. v. Eric King*, 19-cr-257-WJM, Eric King-Direct Examination, October 15, 2021.

### 4.   DENIAL OF MEDICAL CARE

94.     BOP Program Statement 5566.06, particularly, §552.24, is informed by the overarching principles of risk as mitigated by the U.S. Constitution. Yet notwithstanding the obvious beating incurred by Mr. King at the hands of Defendants, BOP medical personnel deliberately

ignored both the risk of the physical injury with respect to the use of four-point restraints itself, specifically done without absolutely any semblance of hydration (water) or access to bathroom facilities. Ignorant to their duties as health professionals and in violation of the Restraint Program Statement, just once during the four-point restraint incident, Defendants Fraboni and Batouche medically examined Mr. King, improperly determining Mr. King did not need further medical care-despite evident injuries, lack of hydration, and less than adequate circulation. Defendants Fraboni and Batouche declining to aid Mr. King or intervene in the torture, as required by their medical licenses.

95.     Defendant Lieutenant Abraham administering a two-hour check on the four-point restraints, failed to note Mr. King's compliance and request a removal of the restraints.

96.     Testifying during an evidentiary hearing that he helped oversee the four-point restraint process and directing the video recording, Defendant Lieutenant Melvin, administering a check on the four-point restraints, similarly failed to note Mr. King's compliance and request a removal of the restraints.

97.     Mr. King **never once** received medical or psychological treatment while in the care and custody of the BOP for the torture by its employees, agents, and/or contractors while held in the Four-Point Restraint.

98.     Mr. King was subsequently charged in the U.S. District Court for the District of Colorado upon an indictment alleging assault of Defendant Wilcox in violation of 18 U.S.C. § 1114. 1:19-cr-00257. Mr. King moved to suppress statements Mr. King made to SIS officials following the use of restraints and *incommunicado* housing August 17-20, 2018. With respect to the physical abuse of Mr. King Presiding Judge Martinez, found that Mr. King has suffered

"physical punishment and psychological intimidation" at the hands of BOP employees during the three days following the August 17, 2018, assault, and subsequently ordered that Mr. King's statements be suppressed as involuntary. *Id*., Doc. 176 at 16.

99.     Mr. King contends that this use of pain, suffering, restraint, and prolonged *incommunicado* detention for the purposes of interrogation amounted to torture as recognized by international law. *See* UN Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (1984) (UNCAT), Article 1.1:

> '*[-] the term "torture" means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.*'

### 5. POST-FLORENCE RETALIATION AND ENDANGERMENT: 2018-2019

100.    Following the August 17, 2018, mop-closet encounter with Lieutenant Wilcox, FCI Florence officers cut Mr. King's clothing off of him and held him in restraints for over six

hours in the "Special Housing Unit," also known as segregated housing, throughout the FCI Florence torture sequence.  He was then transferred and held incommunicado for four days in the SHU of USP Florence until August 21, 2018. Federal law provides for multiple internal BOP reviews of placement, including after three days of placement in the SHU. 28 C.F.R. 541.26(a). Mr. King did not have his SHU housing status reviewed at FCI Florence in August 2018.

101.    In the months following the assault in the closet and subsequent days incommunicado at FCC Florence, the BOP moved Mr. King around the country to various notorious maximum-security facilities, including USP Leavenworth, USP McCreary, and USP Robert E Lee. He was housed in segregation and denied communication and visits with his wife and family throughout.

102.    Starting on August 17, 2018, all Defendants (including John Doe Bureau of Prison Officials) at FCI Englewood, the Florence Correctional Complex (including FCI, USP, and ADX Florence), USP Leavenworth, USP McCreary, and USP Lee conspired to harm Mr. King and interfere with his rights by purposefully housing Mr. King with known violent white supremacists and racially motivating these prisoners to attack Mr. King and deprive Mr. King of his rights based on Mr. King's antiracist beliefs and association with Black people. Defendants manipulated Mr. King's security and housing classification through baseless, retaliatory and racially politically-motivated investigations and disciplinary proceedings.

103.    Mr. King submits that he has been imprisoned in the Special Housing Unit ("SHU") for over 1600 days without due process, i.e., BOP has not undertaken a single review of Mr. King's placement in the SHU as mandated by the Code of Federal Regulations. 28 C.F.R. 541.26. Mr.

King asserts that the Bureau's five-year ongoing and unlawful refusal to engage in procedure to review placement as mandated by federal law constitutes a violation of the Administrative Procedure Act as well as an atypical and significant hardship in violation of the Eighth Amendment's prohibition on cruel and unusual punishment.

104.    Mr. King was imprisoned in the SHU at USP Leavenworth August 22, 2018-February 28, 2019 (date of transfer). His SHU housing placement and status was not reviewed by authorities at USP Leavenworth and Mr. King was not given an opportunity to attend such a review. This denial was in defiance of federal law guaranteeing such a review within seven days of placement and every thirty days thereafter. 28 C.F.R. 541.26(b) and (c).

105.    USP Leavenworth Officials removed Mr. King's ability to access the phone during Mr. King's imprisonment there. On information and belief, this removal of all phone access was in retaliation for a call-in campaign organized by persons outside of the prison motivated by concerns for Mr. King's safety. Mr. King's phone access has not been reinstated to date, including throughout the Coronavirus Pandemic and in spite of the mandates of the COVID CARES Act of 2020.

106.    During Mr. King's imprisonment at USP Leavenworth BOP officials initiated disciplinary proceedings alleging that Mr. King assaulted Lieutenant Wilcox at FCI Florence in August 2018. Exhibit 5: USP Leavenworth 2019 Disciplinary Proceedings. Mr. King maintained his innocence throughout the disciplinary proceedings but was found to have committed the prohibited act of Assault. He was ultimately sanctioned to loss of twenty-seven days of good time credit and sixty days loss of commissary, phone, and visiting privileges.

107.    Mr. King was transferred from USP Leavenworth to USP McCreary on February 28, 2019. USP McCreary psychology staff noted that Mr. King had not had a review of his housing placement. White supremacist prisoners at USP McCreary attacked Mr. King on May 20, 2019. He received medical treatment, but his SHU housing status was not reviewed, nor was Mr. King given an opportunity to attend review of his SHU placement. 28 C.F.R.26(c).

108.    After a brief period at USP McCreary, in July 2019 Bureau staff transferred anti-racist and anti-fascist Mr. King to USP Robert E. Lee in Pennington Gap, Virginia. BOP officials did not review Mr. King's housing placement, nor was Mr. King given an opportunity to be heard regarding his housing while Mr. King was confined at USP Lee. Mr. King voiced a concern about being in danger from white supremacists at USP Lee. Officers at USP Lee did, however, acknowledge the threat to Mr. King's life posed by the white supremacist prisoners at USP Lee and record the racially-based threat in Mr. King's Psychology file. Exhibit 6: USP Lee August 2, 2019, Health Record, filed under seal.

109.    In 2019 BOP staff transported Mr. King back to Colorado from USP Lee to answer the May 2019 indictment in *United States v. Eric King*, 1:19-cr-00257. Despite the prior complaints regarding FCI Englewood staff, and the false threat and /assault allegations following FCI Englewood staff review of his diary, Mr. King was nevertheless placed back into the custody of FCI Englewood to await trial.

## 6. FCI ENGLEWOOD CONSPIRACY, RETALIATION, & INTERFERENCE WITH TRIAL

110.    Following his transfer back to Englewood, BOP staff immediately placed Mr. King in segregated housing except for less than 48 hours at the Federal Detention Center (FDC) in 2019, Mr. King remained in the SHU at FCI Englewood throughout the entire pretrial and trial

period August 2019-March 2022, including during the onset and BOP lockdowns prompted by the COVID-19 pandemic. Not a single review of SHU housing placement or status occurred during his nearly three years of pretrial and trial confinement at Englewood.

111.   It is Mr. King's experience that he faces retaliation, harassment, and baseless disciplinary action (including assault, false imprisonment, and being held incommunicado) every time he asserts his rights pursuant to any administrative, civil, or criminal procedure. This was especially true regarding Mr. King's assertion and exercise of his rights relative to the pending criminal proceedings while Mr. King was housed at FCI Englewood August 2019-March 2022. Throughout the pretrial period at FCI Englewood Mr. King received at least 15 disciplinary shots and lodged over 75 complaints with the Bureau through the administrative remedy process. Counsel includes only some of these disciplinary sanctions and administrative complaints herein to illustrates the FCI Englewood Defendants' retaliatory and inappropriate use of disciplinary sanctions and refusal to allow Mr. King meaningful use of the administrative remedy program.

112.   Retaliation against Mr. King began shortly after his arrival at FCI Englewood to await trial and was facilitated in part by the Defendant United States Marshals Office initiation and maintenance of a baseless investigation into Mr. King and his family commencing September 2019. Mr. King received notice on September 4, 2019 that he was placed in SHU "pending investigation"; this "investigation" persisted until the eve of trial and interfered with Mr. King's First Amendment rights to correspondence and legal counsel September 2019-March 2022. The investigation was without probable cause and resulted in irreparable harm including  severe isolation and mail restrictions imposed on a prisoner in solitary confinement facing trial during the COVID-19 pandemic and exclusion of the public from critical stages of Mr. King's criminal proceedings. The baseless investigation meant that Defendant USMS John

Does ignored known threats to Mr. King's life, health, and safety throughout the pretrial and trial period including the unlawful conspiracy involving Defendants Humphries, Gustafson, and others.

113.    On or about September 17, 2019 a third-party complaint was submitted on Mr. King's behalf following staff failure to respond to Mr. King's complaint in the first weeks of September. Exhibit 7: September 17, 2019 Email and attachments, filed under seal. On September 15, 2019 Mr. King was cited for "Being Unsanitary or Untidy." The allegation was that officers observed an apple, milk carton, and/or water being thrown onto the range from the direction of Mr. King's cell. There was no allegation that Mr. King personally threw trash, but he was nevertheless found in violation of the rules and sanctioned to loss of commissary. Exhibit 8: September 15, 2019 DHO Violation #3304076.

114.    Mr. King was restricted from visitation with his wife and family August 17, 2018-December 14, 2019. Upon his transfer to FCI Englewood he used the administrative remedy process to attempt to regain visits with his wife. In response to Mr. King's administrative remedy request, he was informed that he would not be allowed to visit with his wife "due to this type of behavior and ideology your visits will be denied." Exhibit 9: 2019 Family Visit Grievance Packet, p 2. Staff continued to deny Mr. King visitation with his wife until December 2019, upon reinstatement of visitation privileges, Defendant Warden Greilick informed Mr. King that his wife could only visit on the conditions that his wife not attend any protests, not publish comments about the BOP online, refrain from wearing "political clothes" and that she "be nice to staff."

115.    Defendant Humphries was Mr. King's assigned Unit Team member and Counselor on or about November 1, 2019. Defendant Humphries acted as a co-conspirator in a racially and

ideologically motivated conspiracy to harm Mr. King and to deprive Mr. King of his civil rights;

116.    Defendant Lieutenant Humphries acted as "Chair" of multiple baseless and retaliatory Disciplinary proceedings lodged against Mr. King during the pretrial period. In that role Defendant Humphries used his authority and position to judge and punish Mr. King for alleged rules violations whilst Defendant Humphries simultaneously conspired with Defendant Gustafson and others to assault and harm Mr. King, and to deprive Mr. King of his life as well as his right to belief, expression, and association, and his right to a fair trial.

117.    Mr. King was separated from his property on November 16, 2019. On November 21, 2019, Mr. King and other SHU prisoners protested conditions in the SHU and denial of access to property and commissary forms. In response, the Bureau initiated use of the "Strategic Operations Response Team," who used pepper spray, batons, and an extraction team to disrupt the protest and remove Mr. King from his cell. Mr. King was cited for "Disruptive Conduct/Engaging in group demonstration," and sanctioned. Exhibit 10: November 19, 2019 DHO #3331416. During this period Defendant Humphries separated Mr. King from his legal papers and property such that Defendant Humphries acknowledged that this interfered with Mr. King's pursuit of the administrative remedy process. Exhibit 11: December 12, 2019 Property Separation Memo.

118.    On December 31, 2019, a prisoner in the FCI Englewood Special Housing Unit named Levi John Roberts committed suicide his cell neighboring Mr. King and other prisoners in segregated housing. Distraught after this experience, Mr. King wrote poetry about the death of his fellow prisoner describing the ghoulish conditions of the FCI Englewood SHU and

implicating BOP personnel for their responsibility for and craven reactions to the Roberts suicide.

119.    This poem was posted on a publicly maintained website on January 28, 2020.

> **"The Wrong One"**
>
> Greilick holds the rope
> Excuses will get passed
> "If someone wants to go they will"
> And if someone wants to ignore mental health
> Ignore skipped medications
> keep someone in a silent box
> With no phone calls, no radio, no personal contact
> No stimulation mentally whatsoever
> They also will
> And Warden Greilick did
> Now Roberts is dead
> Deliberate indifference is state murder
> Mail from his family arrived that same day
> Medical needed to wait for an escort
> Even though he was purple
> Day cops will take the blame, but why?
> They didn't institute isolationist policies
> Didn't keep someone pre-trial and openly suicidal
> Buried in a box, with all of the states pressure
> No excuses are needed
> A family lost a son
> In the custody of this warden
> They will never breathe again
> Greilick will continue to collect that 6 figure check
> The wrong neck got burned
> The state got another
> Levi John Roberts was murdered by federally sanctioned torture.

*See* https://supportericking.org/2020/01/28/update-on-erics-confinement-2/

120.    Within twenty-four hours of this poem being posted online, BOP staff including Defendants Quezada, Gustafson, and Humphries sanctioned Mr. King for three rules violations. Mr. King maintains that this disciplinary action was in retaliation for a third party posting of Mr. King's poetry. On January 29, 2020 Defendant Quezada cited Mr. King for "Destruction

of Government property" for alleged presence of threads hanging from the shared bunk in an 8x12 ft. cell. Defendant Humphries was the Chairman of Mr. King's disciplinary proceedings and was responsible for imposing finding and sanctions. Exhibit 12: January 29, 2020 Disciplinary Reports, p 1.

121.    Also on January 29, 2020, Defendant Gustafson wrote Mr. King up twice for "Failure to Stand for Count." Sanctioned to loss of phone, visiting and commissary privileges. *Id*, p 2, 3. Defendant Humphries was the Chairman of these disciplinary proceedings as well.

122.    On March 10, 2020, counsel in Mr. King's criminal matter filed a motion requesting that Mr. King be moved from FCI Englewood due to interference with counsel. In support of the request Mr. King submitted a twenty-page declaration concerning the unlawful and retaliatory conditions of pre-trial confinement in the FCI Englewood SHU. *United States v. Eric King*, 1:19-cr-00257-WJM, Doc. No. 40-1. Within weeks of filing this declaration, the Respondent Bureau including Defendants Quezada, Gustafson, Humphries, Sapp, Startcher, and John Doe FCI Englewood officials-imposed deprivation, threats, and retaliation so severe that Mr. King was placed under suicide precautions in April 2020.

123.    In the twenty-four months between Mr. King's declaration and his criminal trial (and while COVID-19 was raging in federal prisons), Mr. King was cited by Officers at FCI Englewood for multiple false and exaggerated disciplinary sanctions, hospitalized after being assaulted in the shower, sickened by COVID-19, denied access to the grievance process, denied telephone communication and visits with his wife, placed on mail restrictions, and deprived of at least 150 days of good time credit under the guise of illegal and retaliatory disciplinary sanctions while imprisoned in segregated housing.

124.     FCI Englewood Defendants (including John Doe Bureau of Prison Officials) conspired with other BOP Defendants and individual prisoners to harm Mr. King and interfere with his rights by purposefully housing Mr. King with known violent white supremacists and racially motivating these prisoners to attack Mr. King based on Mr. King's antiracist beliefs and association with Black people.

125.     A white supremacist prisoner held at Englewood wrote in 2020 regarding his belief that BOP staff, employees, agents, and contractors were targeting Mr. King, intentionally housing known violent white supremacist prisoners with Mr. King, and soliciting the prisoners to harm Mr. King:

> "I was Eric King's cellmate at FCI Englewood SHU. I was shocked for a few reasons. For one, I am a part of a white gang. I know King's a person who does not believe in racism and the stupid beliefs that white gangs say they believe. I know that Eric is supposed to be the **enemy on the streets and in prison.** The guards have made that known multiple times to me before they moved us in together. The second reason I am shocked they moved us in together is because of my past prison violence. I was told by the warden on down that they will never put someone in my cell because I am a maximum custody and pending ADX…As soon as we moved in I started getting weird comments from the guards saying "you haven't killed him yet" and "your know he's Antifa," "I thought you were enemies"…**Humphries came and told me in a very blunt way that he could make my "Florence" problems go away, If would move back in and "teach Eric some respect."** He said that Eric was a snitch, a check-in and that he put a fake PREA on a guard here. I know that this letter puts me at risk, but the

truth needs to come out. **These guards want to hurt Eric, they want to make his life a living hell, and they will resort to extreme measures."**

*See* Exhibit 13: March 10, 2020 Letter, redacted (emphasis added). The letter explicitly named Defendant Humphries as one of the guards encouraging prisoners to target Mr. King for racially and ideologically motivated violence starting in January 2020.

125.    On March 24, 2020, at the prompting of BOP Counter Terrorism Unit officials, FCI Englewood Officer Barrera initiated disciplinary proceedings against Mr. King for two "greatest severity" violations: Encouraging others to riot and Use of mail to further criminal activity (greatest severity). The stated bases for these accusations was a March 24, 2020 publication by New York Anarchist Black Cross including poetry written by Mr. King and an update about Mr. King's case and confinement. Exhibit 14: March 24, 2020 Incident Report. *See also* https://nycabc.files.wordpress.com/2020/03/updates-24-mar-2020.pdf.

126.    Retaliation and restriction of communication continued in the early months of the COVID-19 pandemic. In April 2020 Mr. King attempted to submit internal complaints regarding harassment, assault, and threats by Defendant Gustafson toward Mr. King. Mr. King attempted to report this behavior to multiple officials at FCI Englewood, including Defendants Starcher and Sapp. Despite Mr. King's request for intervention, Defendant Gustafson was allowed to continue to work in the SHU and retain physical control over Mr. King and his environment.

127.    As a direct and proximate result of the Defendants conspiring against his life, and the retaliatory and improperly motivated disciplinary shots, mail, phone and visit restrictions, and

segregated housing, Mr. King sought psychological assistance and was subsequently placed on suicide precautions on April 16, 2020

128.    Despite suicide precautions and the pandemic raging in the prisons, Defendant SIS officials imposed general mail restrictions and monitoring onto Mr. King in May of 2020. These restrictions were imposed in addition to the nearly two years without phone privileges, and restrictions on family and legal visits due to COVID-19. Ex. 15: May 19, 2020 General Correspondence Restriction.

129.    In complete disregard of Mr. King's request for intervention concerning Defendant Gustafson, on June 18, 2020 Defendant Gustafson was in direct supervisory control of Mr. King in the shower. Defendant Gustafson slammed a handcuffed Mr. King onto his head in the shower; Mr. King lost consciousness and awoke choking on his own blood. Mr. King was transported from the shower to Swedish Hospital in Englewood, Colorado where he was treated for a scalp laceration, head injury and concussion. Mr. King was later cited and sanctioned for attempted assault on Defendant Gustafson.

130.    In November 2020, Mr. King became ill with COVID-19 while housed in segregation at FCI Englewood. He was sick for weeks.

131.    Shortly after Mr. King recovered from COVID-19, members of the Colorado public held a New Year's Eve "noise demonstration" outside of FCI Englewood on December 31, 2020. On information and belief, Mr. King was investigated for this incident for over a year until shortly before his 2022 trial. On January 8, 2021 Bureau staff placed under an "Indefinite" Mail restriction status effective one year prior, on January 6, 2020. Exhibit 16: January 8, 2021

Notice of Restrictions. After his acquittal of violent charges at trial in March 2022, BOP staff cited and sanctioned Mr. King for the December 31, 2020 protest by members of the public outside of the prison.

## 7. TRIAL INTERFERENCE

132.    The criminal matter against Mr. King related to the August 2018 off-camera mop closet encounter with the Defendant Wilcox proceeded to an evidentiary hearing on October 14, 2021, and then to jury trial before the Honorable William J. Martinez on March 14-18, 2022. On March 18, 2022, a jury acquitted Mr. King of assault on a federal officer, effectively finding that Mr. King acted in reasonable self-defense when Lieutenant Wilcox attacked him.

133.    At the time of the October 14, 2021 pretrial evidentiary hearing Mr. King was under investigation by the BOP relative to the December 31, 2020 protest as well as an investigation conducted by the U.S. Marshal Service Defendants. These baseless allegations prompted the United States District Court to *sua sponte* issue an order closing the October 14, 2021 proceedings to the public. This closure of a critical stage of Mr. King's criminal proceedings was a denial of Mr. King's right to Due Process and a public trial.

134.    The Defendants also aimed to interfere with Mr. King's right to participate in his criminal own trial. After each day of trial in March Mr. King faced increasingly hostile and escalated harassment from FCI Englewood staff. Trial began on March 14, 2022. During transportation to and from, Mr. King specifically alerted USMS officials that he feared for his life and safety during trial.

135.    On the evening of March 14, 2022 after the first day of trial, Mr. King returned to FCI Englewood to find that his entire cell had been emptied of all of his property, including attorney-client privileged communications and trial preparation material. Mr. King reported this harassment and interference to John Doe Defendants on FCI Englewood staff and to John Doe Defendants employed by the United States Marshal Service.

136.    Also on March 14, 2022, Mr. King learned Defendant Quezada ordered that Mr. King was to be moved and housed in a "suicide cell" at the Federal Detention Center where he would be observed, surveilled, and under 24-hour lighting. This relocation attempt was known to the John Doe Defendants employed by the United States Marshal Service. On information and belief, Defendant Quezada was one of several BOP staff present observing witness testimony throughout the trial.

137.    The Honorable William J. Martinez admonished BOP staff on March 15, 2022 and ordered that the trial team from the US Attorney's Office was prohibited from viewing Mr. King's materials, that the BOP was prohibited from further separating Mr. King from his papers and property, and that BOP staff should not interfere with Mr. King's ability to communicate and meet with his counsel.

138.    On the evening of March 15, 2023, counsel was advised that Mr. King was at the Federal Detention Center (FDC) Englewood and alerted Defendant Humphries that counsel would visit Mr. King. Upon arrival at the FDC, counsel learned that Mr. King was again housed at the FCI. Following day two of trial, BOP officers moved Mr. King to be housed alone in a single cell on a completely empty range at FCI Englewood. Mr. King learned that during day

two of trial BOP officers again took possession of Mr. King's papers and property in direct contravention of Judge Martinez's orders.

139.   On the evening of March 16, 2022, Mr. King returned to his single cell on the empty FCI Englewood range to find that his cell was flooded and many of his possessions and papers had been destroyed by water and coffee, including his legal papers and photos of his family. Inventory documents of Mr. King's property completed by BOP staff on March 15, 2023 were also destroyed.

140.   Defendants Quezada, John Doe USMS, and other Defendants were present in the courtroom during Mr. King's hearing and intentionally interfered with and harassed the members of the public and Mr. King's family members present in the courtroom.

141.   Mr. King repeatedly requested medical attention from FCI Englewood concerning his head injury and concerning neurological symptoms persisting from the August 17, 2018 date Mr. King was assaulted by FCI Florence Defendants Wilcox, Kammrad, Giconi et al. Despite obvious symptoms, FCI Englewood officials were deliberately indifferent to this serious health need and did not attend to Mr. King's request for neurological examination or treatment.

142.   From the date of passage of the COVID-CARES Act in 2020 until Mr. King's transfer to another facility following his acquittal in March 2022, FCI Englewood did not provide Mr. King with a single phone call or video visit pursuant to COVID-CARES Act. *See* 28 CFR 540.106.

143.    From August 23, 2019 until his transfer to another facility following his acquittal in March 2022, FCI Englewood staff did not provide Mr. King with a single review of his placement in the SHU.

### 7. ULTIMATE RETALIATION: DELIBERATE MEDICAL INDIFFERENCE, RELIGIOUS DEPRIVATION OF MR. KING IN UNREVIEWED SEGREGATED HOUSING AT ADX

144.    Following the March 18, 2022 acquittal of criminal charges, the BOP continued to retaliate against Mr. King for exercise of his rights, including his right to trial and to cross-examine the Florence and Englewood officers involved in the assault and torture of Mr. King. Shortly following the acquittal, BOP again moved Mr. King around the country to various facilities, including Grady County, Oklahoma jail, a brief visit at USP Atlanta Transfer Center, and a second placement at USP Lee May-August 2022. Mr. King was transferred to USP Lee despite USP Lee having prior knowledge and documentation of a known white supremacist threat to Mr. King's life and safety in the facility. *See* Exhibit F.

145.    While housed in the SHU at USP Lee Mr. King learned that proceedings were underway to place him at Florence ADX, and that the BOP officials planned to place Mr. King at the ADX regardless of whether he won or lost at his criminal trial.

146.    BOP approved his transfer to ADX during the summer of 2022. Upon information and belief, this transfer was based on Mr. King's stated belief and associations as an anti-racist, antifascist anarchist.

147.    BOP officials removed Mr. King from USP Lee in August 2022 and transported him to Colorado where he arrived at the ADX. Now, Mr. King once again finds himself incarcerated in a facility where he faces the threat of potentially lethal violence, including interference and

threats from officers involved in the criminal assault allegation that proceeded to trial in March 2022.

148.    Despite affirmative rulings in his criminal case, Mr. King is currently incarcerated in ADX at the highest security levels and subject to extremely restrictive communication(s) guidelines. Not only is the ADX unnecessarily restrictive and punitive for Mr. King, but it is also a high security facility–a wholly excessive placement given that Mr. King has a Criminal History Category of I and is serving the final months of an illegally prolonged sentence following a plea deal for a crime of property destruction.

## A.    UNITED STATES PRISON ADMINISTRATIVE MAXIMUM FACILITY (ADX)

149.    The United States Prison Administrative Maximum Facility (hereinafter 'ADX'), operated by the BOP, is the most restrictive prison in the United States, and one of the most notorious in terms of prison conditions in the world. ADX is classified as a supermax or control unit prison and is part of the Federal Correctional Complex, Florence.

150.    Similarly, Federal Correctional Institution, FCI Florence, where the August 17, 2018, attack upon Mr. King occurred, discussed *infra*, is a prison that is part of the Federal Correctional Complex, Florence.

151.    Despite a projected release date of approximately May of 2023 and contrary to BOP classification program statement guidelines, Mr. King is currently incarcerated at ADX.

152.    Located in rural Florence, Colorado, ADX is often referenced as the 'Alcatraz of the Rockies,' and compared to Guantanamo Bay. The conditions of isolation, torture, and the risk of suicide, are so extreme that upon an extradition request by the United States, a London court refused to extradite Wikileaks co-founder Julian Assange upon credible suspicion that he would be held in ADX. Betsy Reed, *Assange ruling confirms US prisons' grim record, experts say*, THE GUARDIAN, January 4, 2021.

153.    Prisoners at ADX have little communication to the outside world, including with their attorneys. Sensory deprivation, a key feature of ADX, is intended to completely divorce the prisoner from any direct human contact, including with correctional officers, and is devoid of sound. Even when allowed out of their cell or outdoors, it is done so in a cage and all together intends to entirely obfuscate to the prisoner their location in the prison, thereby completely disorienting the prisoner for their entire incarceration at ADX. Prisoners are housed in a 7ft x 12ft cell for twenty-three hours per day. All meals and bathing take place inside of the cell.

154.    The window in each cell is so small that inmates cannot tell where they are by looking outside of the window. The remaining twenty-three hours of each day, the prisoners are confined in single cells with accommodations made of poured, reinforced concrete to deter self-harm. Given these conditions the risk of and actual suicide at ADX is not surprising. The conditions there are thought to cause and exacerbate serious mental illness. Andrew Cohen, *How America's Most Famous Federal Prison Faced a Dirty Secret: The Case That Awakened Us to the Mental Health Trauma of Supermax*, THE MARSHALL PROJECT, December 5, 2016.

155.    Range 13, where upon information and belief Mr. King is thought to be held, is a

special four-cell wing within the Special Housing Unit (SHU) for inmates who the BOP

classifies as needing the highest degree of control. The Defendants publicly admit that ADX

is reserved for what they characterize as the most dangerous prisoners incarcerated within the

BOP system. After over 1600 days of isolation in segregated housing, BOP officials still

refuse to review Mr. King's placement in the SHU.

## B.    ONGOING INTERFERENCE WITH RELIGIOUS PRACTICE

156.    Mr. King has spent most of his time in BOP custody in some form of segregation,

with significant communication limitations. He has been denied proper access to mail, phone,

or in-person visits with his wife, children, and community. Held in profoundly inhumane

conditions, Mr. King had little to turn to except his religious practice and personal

convictions in order to survive incarceration.

157.    The BOP has routinely denied Mr. King free exercise of his religion during the period

of confinement in violation of the Free Exercise Clause of the First Amendment and the

Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1(a) ("RFRA")

158.    The BOP has consistently denied Mr. King access to vegan meals, as he has been

served eggs, dairy products, and meat on his meal trays routinely across facilities, in part as

retaliation for Mr. King's political convictions and outspoken nature. Mr. King has endured

frequent mocking of his religious diet by facility staff. Also, BOP has used Mr. King's

religious beliefs as another method of retaliation to deprive him of adequate nutrition, and to

further attempt to humiliate him.

159.    Mr. King has been and continues to be denied access to religious counsel and practice. Witch and magical practices emphasize the relationship between beings. As such, ceremony and ritual are performed in collective settings. Additionally, the religious practice of magic requires texts and items not readily available to Mr. King in his cell–such as items from nature and real or artificial candles.

160.    The Bureau has imprisoned Mr. King for over 1600 days Secure Housing Unit ("SHU") or segregation. Commencing in August 2018 at FCI Florence and continuing now at ADX, Mr. King has been denied access to group religious activities including participating in a group of incarcerated individuals who practice his faith.

161.    RFRA provides that the government may not "substantially burden a person's exercise of religion" without demonstrating that doing so furthers a compelling governmental interest in the least restrictive manner. 42 U.S.C. § 2000bb-1. The BOP has instead alienated Mr. King from all ability to practice his religion while incarcerated.

### C.    ONGOING DENIAL OF MEDICAL TREATMENT

162.    The BOP has consistently withheld medical treatment for both acute and chronic health needs from Mr. King in a manner that is clearly intentional, deliberate, knowing, willful, wanton, and malicious.

163.    Over the course of his incarceration, Mr. King has spent most of his time in segregated or solitary confinement. International and national academic research has well established that long-term solitary confinement has catastrophic health impacts that can lead to physical anguish, memory loss, reduced cognition, agitation, sleep disturbances, and psychosis. Individuals in long-term solitary incarceration run the risk of a permanent

psychiatric condition that causes an extreme intolerance to social or external stimuli, including talking, plumbing sounds, traffic noise, and other unavoidable sensations outside of the prison environment. Despite the well documented risks of solitary incarceration and multiple incidents of declining mental health, Mr. King was never meaningfully assessed for his ability to withstand the conditions.

164.    On August 17, 2018, as detailed above, Mr. King was assaulted, smothered, and placed in four-point restraints. In violation of BOP Program Statement 5566.06, Mr. King did not receive adequate monitoring for physical distress, supporting interventions to prevent physical distress, or evaluation for potentially serious injury after the events. Instead, Mr. King was left to urinate on himself and endure significant physical pain. Mr. King was partially smothered with a face shield and a sign was left on the door stating that prison staff was to have no further contact with Mr. King—thereby creating increased danger for Mr. King.

165.    Mr. King was left in hard restraints, which pose significant health risks to the restrained party particularly when arms are restrained over the head, including positional asphyxia, thoracic outlet syndrome, brachial plexus injury, articular or bony injury, and cardiovascular compromise. Many of these conditions cause long-term pain that can only be addressed with proper diagnosis. However, Mr. King has never been meaningfully evaluated.

166.    Since this incident, Mr. King has suffered from chronic and severe headaches that were reported to BOP staff and contractors on multiple occasions. However, Mr. King has not been meaningfully evaluated or treated for this condition. Chronic untreated headaches can lead to an onslaught of secondary medical issues including sleep disturbances, psychological distress, suicidal ideation, dental issues, visual disturbances, reduced cognitive function, lack of problem-solving skills, and irritation.

167.    On or about May 2019, Mr. King was assaulted by white supremacists in the prison

yard at USP McCreary where he suffered multiple physical blows. Mere days later, Mr. King

was escorted to a prison yard with another white supremacist who struck Mr. King on the

head. He did not receive meaningful medical evaluation.

168.    On or about August 2019, Mr. King began to experience stroke-like symptoms while

being held at USP Lee. Mr. King had sudden onset aphasia, hemiparesis, confusion, and

facial asymmetry—all prominent symptoms of potential stroke. Despite Mr. King's history of

three recent traumatic head injuries and an elevated risk for stroke due to family history, Mr.

King did not receive hands-on medical care. Instead, medical staff observed him from outside

of the cell and declared Mr. King had Bells Palsy. All symptoms dissipated in 24 hours and

Mr. King did not receive any follow up medical evaluation.

168.    On June 18, 2020 Mr. King was handcuffed dropped onto the cement floor head-first

in the FCI Englewood shower by Defendant Gustafson, who lifted Mr. King while and Mr.

King's hands were restrained and he was not able to shield himself. Mr. King was transported

to a medical facility for a CT scan and sutures at this time. He was diagnosed as having a

head injury.

169.    Following the 2020 head injury, Mr. King suffered from vertigo for months, often

unable to walk or navigate the prisons safely. He has yet to receive further evaluation or

consult with a neurologist.

170.    Upon information and belief, in March of 2022, Mr. King was presenting with

symptoms of a traumatic brain injury (TBI) and that necessitated a neurology consult. Mr.

King presented with a significant change in affect, cognition, sensory processing, and self-

regulation. He has yet to be evaluated.

171.    Head injury diagnosis and treatment is complex. A single test, such as a CT scan, or a one-time visit with an emergency medical provider are seldom enough to fully understand the impacts and the progression of such an injury, particularly when there have been repeat head injuries. True diagnosis typically requires repeat neurological evaluation and comprehensive imaging. Mr. King's symptoms require such care. Additionally, the treatment for head injuries such as traumatic brain injury or concussion are often counter to the demands of life in a federal prison, such as avoiding exposure to harsh lighting, mental rest, increased sleep, specific diet, and avoiding physical exertion.

172.    Refusal of medical care to an individual with at least four significant traumatic head injuries, a history of sustained headaches, stroke-like symptoms, and vertigo comes with great risk. Untreated injury can cause loss of brain function, stroke, seizures, Alzheimer's, suicidal ideations, epilepsy, reduced cognitive function, personality changes, sensitivity to light, difficulty problem solving, aggression, paranoia, and depression. These issues may last a lifetime and prevent an individual such as Mr. King from surviving the realities of the prison environment as well as re-entering his community.

## V.    CLAIMS FOR RELIEF

173.    Mr. King seeks relief pursuant to civil rights provisions of the Klan Act including 42 U.S.C. 1985(3) and 1986, and *Bivens v. Six Unnamed Agents of the Federal Bureau of Investigations*, 403 U.S. 388 (1971), as well as the Federal Torts Claims Act (hereinafter "FTCA") and the Administrative Procedure Act (hereinafter "APA").

### FIRST CAUSE OF ACTION: FEDERAL CIVIL RIGHTS LAW

#### Count One
#### 42 U.S.C. 1985(3) Conspiracy Against Civil Rights - Florence Assault, Torture, Incommunicado
(Against  Defendants D. Wilcox, Kammrad, Giconi, Carroll, White, Garduno, Brink, Abraham, Reynolds, Fraboni, Batouche, J. Wilcox, Cordova, and Melvin)

174.    Plaintiff restates and realleges each and every paragraph of this Complaint as if fully set forth here.

175.    By their actions, the above-named Defendants did unlawfully and knowingly conspire for the purpose of depriving Mr. King, an anti-racist antifascist anarchist Wiccan committed to acting in solidarity with Black people, of equal protection of the laws, and of equal privileges and immunities under the laws.

176.    The defendants committed overt acts in furtherance of the conspiracy, including but not limited to acts of assault, battery, torture, unlawful imprisonment, and spoliation and alteration of records; whereby Mr. King was injured in his person and his property, maliciously prosecuted and deprived of exercise of rights and privileges of a citizen of the United States, including his right to trial. These injuries and deprivations are ongoing.

177.    The conspiracy targeted and harmed Plaintiff's rights as protected under the Fourth, Eighth, and Fourteenth Amendments, as described in detail herein.

178.    The individual Defendants are liable to Plaintiff under Bivens for the damages Plaintiff sustained, as alleged herein, including but not limited to compensatory damages for medical bills, pain and suffering, humiliation, emotional distress, and loss of enjoyment of life, and punitive damages against the individual defendants in an amount according to proof.

**Count Two:**
**42 U.S.C. § 1985(3) Ongoing Conspiracy with White Supremacist Prisoners**
(Defendants FCI Florence Defendants D. Wilcox, Kammrad, Giconi, Carroll, White, Garduno, Brink, Abraham, Reynolds, Fraboni, Batouche, J. Wilcox, Cordova, and Melvin (including John Doe Bureau of Prison Officials), FCI Englewood Defendants including Defendant Humphries, Gustafson and John Doe officials)

175.    Plaintiff restates and realleges each and every paragraph of this Complaint as if fully set forth here.

176.    The above-named Defendants, as well as USP Leavenworth officials, USP McCreary officials, and USP Lee officials conspired with white supremacist prisoners to harm Mr. King and interfere with his rights by purposefully housing Mr. King with known violent white supremacists and racially motivating these prisoners to attack Mr. King and deprive Mr. King of the privileges and immunities of the law based on Mr. King's antiracist beliefs and association with Black people.

177.    The Defendants committed overt acts in furtherance of the conspiracy; whereby Mr. King was injured in his person and his property, maliciously prosecuted, and deprived of exercise of rights and privileges of a citizen of the United States.

178.    The Defendants further knowingly enabled and were indifferent to the overt acts of others, specifically, other incarcerated persons' physically abusive behavior towards Plaintiff.

179.    The individual Defendants are liable to Plaintiff under 42 U.S.C. § 1985(3) Ongoing Conspiracy

180.    Plaintiff sustained, as alleged herein, including but not limited to compensatory damages for medical bills, pain and suffering, humiliation, emotional distress and loss of enjoyment of life, and punitive damages against the individual defendants in an amount according to proof.

**Count Three:**
**42 U.S.C. §1986 Failure to Protect –**
**Florence Medical Officers and Command Staff**
(Defendant Nurses Fraboni and Batouche, Defendant Captains Melvin and Giconi, Warden Defendants Matevousian, Goetz, Lennon, John F. Williams,  Erlinda Hernandez, Tonya Hawkins, David Christensen)

181.    Plaintiff restates and realleges each and every paragraph of this Complaint as if fully set forth here.

182.    The above named Defendants knew of the racially and ideologically-motivated Florence conspiracy to harm or kill Mr. King and to deprive him of equal protection of the laws and, with knowledge of the conspiracy, and with the power and position to aid or prevent commission of a violation of the law with respect to Mr. King, neglected or refused to prevent or interfere with the unlawful conspiracy to harm Mr. King and interfere with Mr. King's exercise of his rights, including his right to trial.

183.    Defendants Fraboni, Batouche, Matevousian failed to protect Mr. King from the wrongful acts committed by conspirator Defendants including assault, battery, torture, and interference with trial rights.

184.    The above-named Defendants had the full capacity to prevent harm to Mr. King through a variety of measures and deliberately chose not.

185.    Plaintiff sustained, as alleged herein, including but not limited to compensatory damages for medical bills, pain and suffering, humiliation, emotional distress and loss of enjoyment of life, and punitive damages against the individual defendants in an amount according to proof.


### Count Four:

**42 U.S.C. §1983 8th Amendment Violation**
**Florence Torture Sequence**
**(FCI Florence Defendants D. Wilcox, Kammrad, Giconi, Carroll, White, Garduno, Brink, Abraham, Reynolds, Fraboni, Batouche, J. Wilcox, Cordova, and Melvin)**

186.    Plaintiff restates and realleges each and every paragraph of this Complaint as if fully set forth here.

178.    At all relevant times, Mr. King was a prisoner serving a sentence in a federal facility and had clearly established rights under the 8th Amendment including to be free from cruel and unusual punishment.

179.    Each of the defendants named herein subjectively knew and intentionally and deliberately disregarded Mr. King's constitutional protections against cruel and unusual punishment.

180.    The aforementioned defendants knowingly and deliberately assaulted Mr. King and proceeded to engage in an hours long torture sequence, stripping him of his clothing, restraining him using hard cuffs, threatening him with sexual assault, and smothering him with a face shield. Mr. King was denied any protective medical checks.

181.    Each Defendant recklessly and knowingly engaged in this attack.

182.    Plaintiff sustained, as alleged herein, including but not limited to compensatory damages for medical bills, pain and suffering, humiliation, emotional distress and loss of enjoyment of life, and punitive damages against the individual defendants in an amount according to proof.

## Count Five:
### 42 U.S.C. § 1983 8th Amendment Violations
### Medical Deliberate Indifference Florence
**(FCI Florence Defendants D. Wilcox, Kammrad, Giconi, Carroll, White, Garduno, Brink, Abraham, Reynolds, Fraboni, Batouche, J. Wilcox, Cordova, and Melvin)**

180.    Plaintiff restates and realleges each and every paragraph of this Complaint as if fully set forth here.

181.    At all relevant times Mr. King was a prisoner serving a sentence in a federal facility and had clearly established rights under the 8th Amendment including to be free from deliberate indifference.

182.    Each of the defendants named herein subjectively knew and intentionally and deliberately disregarded Mr. King's constitutional protections against deliberate indifference.

183.    Following brutal physical assault and hours in hard restraints, Mr. King is never evaluated for injury.

184.    Mr. King still suffers from neurological symptoms following this brutal assault nearly five years ago and has yet to receive medical treatment to diagnose or alleviate his potentially serious medical concerns.

185.    Plaintiff sustained, as alleged herein, including but not limited to compensatory damages for medical bills, pain and suffering, humiliation, emotional distress and loss of enjoyment of life, and punitive damages against the individual defendants in an amount according                                          to                                          proof.


**Count 6:**
**42 U.S.C. 1985(3) Conspiracy Against Civil Rights - Englewood**
(Englewood Defendants Humphries, Gustafson, and John Doe Defendants, John Doe Defendants, Warden Defendants Greilick and Williams)

184.    Plaintiff restates and realleges each and every paragraph of this Complaint as if fully set forth here.

185.    The above-named Defendants, as well as unnamed coconspirators, did unlawfully and knowingly conspire for the purpose of depriving Mr. King, an anti-racist antifascist anarchist Wiccan committed to acting in solidarity with Black people, of equal protection of the laws, and of equal privileges and immunities under the laws.

186.    The Defendants committed overt acts in furtherance of the conspiracy, including but not limited to acts of assault, battery, harassment and orchestration of Mr. King's placement at ADX; whereby Mr. King was injured in his person and his property, maliciously prosecuted and deprived of rights and privileges of a citizen of the United States.

187.    Plaintiff sustained, as alleged herein, including but not limited to compensatory damages for medical bills, pain and suffering, humiliation, emotional distress and loss of enjoyment of life, and punitive damages against the individual defendants in an amount according to proof.

**Count Six:**

**Free Exercise Clause U.S. Const. amend. I and the Religious Freedom Restoration Act,
42 U.S.C. § 2000bb-1(a) ("RFRA")—
Interference with Free Exercise of Religion in FCI Englewood**
Defendants Quezada, Sapp, Starcher, Defendant Warden Greilick, Defendant Regional
Director Matevousian, and John Doe officials from FCI Englewood

187.    Plaintiff restates and realleges each and every paragraph of this Complaint as if fully set forth here.

187.    Defendants denied Mr. King's ability to participate in his religious practice of group ceremony, access religious materials, and attend groups with prisoners sharing his religious identity under the pretext of his housing in the SHU.

188.    Defendants served Mr. King meals that violated his religious diet, taunted him for adhering to a religious diet, and forced him to choose between adequate nutrition or observance of his religious diet.

189.    Interference with Mr. King's free exercise of religion was not done in the least restrictive means and did not serve a compelling government interest. In fact, it was done solely to further humiliate and dehumanize Mr. King.

190.    Plaintiff is entitled to monetary and punitive damages against the individual defendants in an amount according to proof.

**<u>Count 7:</u>
42 U.S.C. §1986 Failure to Protect – Englewood**
(Englewood Defendants Quezada, Sapp, Starcher, Defendant Warden Greilick, Defendant
Regional Director Matevousian, and John Doe officials from FCI Englewood, FCI Florence,
and the U.S. Marshal Service)

191.    Plaintiff restates and realleges each and every paragraph of this Complaint as if fully set forth here.

192.    Beginning on or about January 1, 2020, the above-named Defendants knew of the racially and ideologically motivated Englewood conspiracy to harm Mr. King and to interfere with exercise of his rights.

193.    Defendants Quezada, Sapp, Starcher, Defendant Warden Greilick, Defendant Regional Director Matevousian, and John Doe officials from FCI Englewood, FCI Florence, and the U.S. Marshal Service, with knowledge of the conspiracy to deprive Mr. King of equal protection of the laws, and with the power and position to aid or prevent commission of a violation of the law with respect to Mr. King, neglected or refused to prevent or interfere with the unlawful conspiracy to harm Mr. King and interfere with exercise of his rights.

194.    Defendants Quezada, Sapp, Starcher, Defendant Warden Greilick, Defendant Regional Director Matevousian, and John Doe officials from FCI Englewood, FCI Florence, and the U.S. Marshal Service failed to protect Mr. King from the wrongful acts committed by conspirator Defendants including harassment, assault and battery, including the assault and battery perpetrated against Mr. King by Defendant Gustafson in the shower of the SHU at FCI Englewood on June 18, 2020.

195.    Plaintiff sustained, as alleged herein, including but not limited to compensatory damages for medical bills, lost property, pain and suffering, humiliation, emotional distress and loss of enjoyment of life, and punitive damages against the individual defendants in an amount according to proof.

### Count Nine:
### 42 U.S.C. §1986 Failure to Protect –
### Trial Interference
(Defendants Quezada, Sapp, Starcher, Defendant Warden Williams, Defendant Regional Director Matevousian, and John Doe officials from FCI Englewood, FCI Florence, and the U.S. Marshal Service)

196.    Plaintiff restates and realleges each and every paragraph of this Complaint as if fully set forth here.

197.    Beginning on or about January 1, 2020, Defendants Quezada, Sapp, Starcher, Defendant Warden Greilick, Defendant Regional Director Matevousian, and John Doe officials from FCI Englewood, FCI Florence, and the U.S. Marshal Service knew of the racially and

ideologically motivated conspiracy to harm Mr. King and to interfere with exercise of his rights.

198.     Defendants Quezada, Sapp, Starcher, Defendant Warden Greilick, Defendant Regional Director Matevousian, and John Doe officials from FCI Englewood, FCI Florence, and the U.S. Marshal Service, with knowledge of the conspiracy to deprive Mr. King of equal protection of the laws, and with the power and position to aid or prevent commission of a violation of the law with respect to Mr. King, neglected or refused to prevent or interfere with the unlawful conspiracy to harm Mr. King.

199.     Defendants Quezada, Sapp, Starcher, Defendant Warden Greilick, Defendant Regional Director Matevousian, and John Doe officials from FCI Englewood, FCI Florence, and the U.S. Marshal Service failed to protect Mr. King from the wrongful acts committed by conspirator Defendants including harassment, conversion/destruction of property, and interference with Mr. King's criminal hearings and trial October 14, 2021 and March 14-18, 2022.

200.     Plaintiff is entitled to monetary and punitive damages against the individual defendants in an amount according to proof.

**Claim Ten:**
**42 U.S.C. §1983 8th Amendment Cruel & Unusual**
**Pretrial Punishment Englewood 8/2019-3/2022**
(Englewood Defendants, Defendant Wardens Greilick and Williams, as well as John Doe and unnamed co-defendants)
201. Plaintiff realleges and incorporates each and every allegation contained in the preceding paragraphs.

202.     All named Defendants engaged in nearly three years of outrageous and atypical treatment of Mr. King while he was in pretrial custody. The FCI Englewood Defendants Defendant Wardens Greilick and Williams, as well as John Doe and unnamed co-defendants

imposed conditions amounting to atypical and significant hardship; these conditions include years of isolation, deliberate indifference to significant health needs, multiple false and exaggerated disciplinary sanctions, assault requiring hospitalization, being sickened by COVID-19, denial of telephone communication and visits with his wife and family (even under the CARES Act), placement on mail restrictions and restrictions of communications with the public, and deprivation of at least 150 days of good time credit under the guise of illegal and retaliatory disciplinary sanctions while imprisoned in segregated housing awaiting trial on a criminal indictment.

203.    These conditions amount to a violation of both the 8th Amendment's guarantee against Cruel and Unusual punishment as well as the Mandela Rules for Treatment of Prisoners.

204.    Plaintiff sustained, as alleged herein, including but not limited to compensatory damages for medical bills, pain and suffering, humiliation, emotional distress, and loss of enjoyment of life, and punitive damages against the individual defendants in an amount according to proof.

## Count Eleven:
### 8th Amendment Cruel & Unusual punishment –
### Trial Interference
(All Defendants, named and unnamed)

205.    Plaintiff realleges and incorporates each and every allegation contained in the preceding paragraphs.

206.    All named Defendants, as well as John Doe and unnamed co-defendants have engaged in over four years of ongoing and unlawful interference with Mr. King's access to the courts and Mr. King's right to trial and to speak in his own defense.

207.    The unlawful interference with Mr. King's criminal hearings and trial October 14, 2021 and March 14-18, 2022 took the form of harassment, baseless investigation,

conversion/destruction of property, and interference with Mr. King's hearings including his criminal jury trial.

208.    This type of interference with a prisoner's ability to exercise his rights at trial constitutes an atypical and significant hardship in violation of the Eighth Amendment's prohibition on cruel and unusual punishment as well as the Mandela Rules for Treatment of Prisoners.

209.    Plaintiff is entitled to monetary and punitive damages against the individual defendants in an amount according to proof.

## Count Twelve:
### 42 U.S.C. §1983 8th Amendment Deliberate Indifference– Denial of Medical Treatment
(all named Defendants)

210.    Plaintiff realleges and incorporates each and every allegation contained in the preceding paragraphs.

211.    Over the course of Mr. King's incarceration within the BOP, he has suffered at least four closed head injuries, significant neurological symptoms consistent with life threatening injury or illness, ongoing headaches, and cognitive changes.

212.    All above named Defendants knew or witnessed that Mr. King experienced blunt force trauma to the head and/or present with symptoms consistent with traumatic brain injury.

213.    All above named Defendants have received enough training on prison protocols, emergency management, first aid, or advanced medical training to possess constructive that injuries of the brain, particularly repeated brain injuries, pose substantial risk to the life and safety of an incarcerated person.

214.    Mr. King has yet to receive medical care to address his head injury and related symptomology that has included signs of stroke, months of impairment, and chronic headaches.

215.    The actions and omissions of Defendants were intentional, deliberate, knowing, willful, wanton, and malicious, with the specific intent of inflicting punishment upon Plaintiff, in violation of Plaintiff's rights under the Eighth Amendment to the United States Constitution, thereby entitling Plaintiff to an award of punitive damages.

216. The individual Defendants are liable to Plaintiff under Bivens for the damages Plaintiff sustained, as alleged herein, including but not limited to compensatory damages for medical bills, pain and suffering, humiliation, emotional distress, and loss of enjoyment of life, and punitive damages against the individual defendants in an amount according to proof.

## Count Thirteen:

**Free Exercise Clause U.S. Const. amend. I and the Religious Freedom Restoration Act,
42 U.S.C. § 2000bb-1(a) ("RFRA")—
Interference with Free Exercise of Religion in USP Florence**
(All Defendants, named and unnamed)

217.    Plaintiff realleges and incorporates each and every allegation contained in the preceding paragraphs.

218.    All Defendants, named and unnamed, have interfered with and restricted Mr. King's fundamental right to the free exercise of his religion in an effort to retaliate against Mr. King for his activism and his outspoken nature. This has included preventing Mr. King from group ceremony, denial of religious items, and depriving Mr. King of his religious vegan diet.

219.    Defendants have failed to surface a compelling governmental interest as to why Mr. King's free exercise has been restricted. Instead, Defendants have used Mr. King's religion as another outlet for harassment and humiliation.

220.    Plaintiff is entitled to monetary and punitive damages against the individual defendants in an amount according to proof.

**Court Fourteen:**
**42 U.S.C. 1983 8th Amendment**
**Cruel & Unusual Punishment - SHU without Review**
(All Defendants, named and unnamed)

221.    Plaintiff realleges and incorporates each and every allegation contained in the preceding paragraphs.

222.    All named Defendants, as well as unnamed co-defendants at USP Leavenworth, USP McCreary, USP Lee have engaged in over four years of ongoing and unlawful refusal to provide Mr. King with Due Process by reviewing placement as mandated by federal law.

223.    This refusal to review Mr. King's placement in segregated housing for extended pretrial imprisonment period during the COVID-19 pandemic constitutes an atypical and significant hardship disproportionate to his crime of conviction in violation of the Eighth Amendment's prohibition on cruel and unusual punishment and the Mandela Rules for Treatment of Prisoners.

224.    The individual Defendants are liable to Plaintiff under Bivens for the damages Plaintiff sustained, as alleged herein, including but not limited to compensatory damages for medical bills, pain and suffering, humiliation, emotional distress and loss of enjoyment of life, and punitive damages against the individual defendants in an amount according to proof.

**SECOND CAUSE OF ACTION: FEDERAL TORT CLAIMS ACT**

**Count Fifteen:**
**28 U.S.C. § 1346 FTCA**
**Defendant Donald Wilcox Assault & Battery August 17, 2018**
(Defendant Donald Wilcox)

225.    Plaintiff restates and realleges each and every paragraph of this Complaint as if

fully set forth here.

226.     Plaintiff brings this cause of action pursuant to the FTCA, 28 U.S.C. §§ 1346 and 2671 et. seq., for damages caused to Plaintiff as a result of being physically assaulted and injured by agents of the United States. The FTCA provides, in relevant part, that the "United States shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances."

227.     On August 17, 2018, in violation of the Federal Tort Claim Act, Defendant Donald Wilcox did assault and batter Mr. King while the Defendant was acting as an officer of the Bureau of Prisons, an Agency of the United States Department of Justice. Such assault resulted in physical injury to Mr. King.

228.     Plaintiff has complied with the procedural requirements of the FTCA. On February 23, 2021, Plaintiff served an FTCA claim on Defendant United States by and through the Western Regional Office of the BOP. The United States, through the BOP, has not yet responded to his claim. Accordingly, Plaintiff's Complaint complies with the requirements of the FTCA and is timely.

**Count Sixteen:**
**28 U.S.C. § 1346 FTCA**
**FTCA Florence Defendants Assault & Battery Yard Beatdown & Stryker Chair**
**August 17, 2018**

229.     Plaintiff restates and realleges each and every paragraph of this Complaint as if fully set forth here.

230.     Plaintiff brings this cause of action pursuant to the FTCA, 28 U.S.C. §§ 1346 and 2671 et. seq., for damages caused to Plaintiff as a result of being physically assaulted and injured by agents of the United States.

231.     On August 17, 2018, in violation of the Federal Tort Claim Act, Defendants Kammrad, Giconi, Carroll, White, Garduno, Brink, Abraham, and Reynolds did assault and batter Mr. King while the Defendants were acting as an officer of the Bureau of Prisons, an Agency of

the United States Department of Justice. The assault and battery resulted in physical injury to Mr. King.

232.    Plaintiff has complied with the procedural requirements of the FTCA. On February 23, 2021, Plaintiff served an FTCA claim on Defendant United States by and through the Western Regional Office of the BOP. The United States, through the BOP, has not yet responded to his claim. Accordingly, Plaintiff's Complaint complies with the requirements of the FTCA and is timely.

**Count Seventeen:**
**28 U.S.C. § 1346 FTCA**
**FTCA Florence Defendants Assault & Battery Torture Sequence August 17, 2018**

233.    Plaintiff restates and realleges each and every paragraph of this Complaint as if fully set forth here.

234.    Plaintiff brings this cause of action pursuant to the FTCA, 28 U.S.C. §§ 1346 and 2671 et. seq., for damages caused to Plaintiff as a result of being physically assaulted and injured by agents of the United States.

235.    On August 17, 2018, in violation of the Federal Tort Claim Act, Defendants Kammrad, Giconi, Carroll, White, Garduno, did use unlawful force and application of restraint to assault, batter and torture Mr. King. These acts were committed by the Defendants while the Defendants were acting as an officer of the Bureau of Prisons, an Agency of the United States Department of Justice. The assault and battery during this torture sequence resulted in physical injury to Mr. King.

236.    Plaintiff has complied with the procedural requirements of the FTCA. On February 23, 2021, Plaintiff served an FTCA claim on Defendant United States by and through the Western Regional Office of the BOP. The United States, through the BOP, has not yet responded to his claim. Accordingly, Plaintiff's Complaint complies with the requirements of the FTCA and is timely.

**Count Eighteen:**
**28 U.S.C. § 1346 FTCA**
**FTCA Defendant Gustafson Assault June 18, 2020**

237.    Plaintiff restates and realleges each and every paragraph of this Complaint as if fully set forth here.

238.    Plaintiff brings this cause of action pursuant to the FTCA, 28 U.S.C. §§ 1346 and 2671 et. seq., for damages caused to Plaintiff as a result of being physically assaulted and injured by agents of the United States.

239.    On August 17, 2018, in violation of the Federal Tort Claim Act, Defendants Kammrad, Giconi, Carroll, White, Garduno, did use unlawful force and application of restraint to assault, batter and torture Mr. King. These acts were committed by the Defendants while the Defendants were acting as an officer of the Bureau of Prisons, an Agency of the United States Department of Justice. The assault and battery resulted in physical injury to Mr. King.

240.    Plaintiff has complied with the procedural requirements of the FTCA. On February 23, 2021, Plaintiff served an FTCA claim on Defendant United States by and through the Western Regional Office of the BOP. The United States, through the BOP, has not yet responded to his claim. Accordingly, Plaintiff's Complaint complies with the requirements of the FTCA and is timely.

**THIRD CAUSE OF ACTION: ADMINISTRATIVE PROCEDURE ACT "APA"**

240.    An agency must abide by its own regulation, especially where the regulation is intended to benefit human rights and prevent abuses by persons in positions of great discretion and power.

241.    Here the Defendant, through the U.S. Department of Justice, Bureau of Prisons, FCI Florence, has disregarded its obligation to Mr. King by violating its own regulations regarding

the review of placement in the Special Housing Unit and Use of Force/Application of Restraints, causing Mr. King substantial harm.

## Count Nineteen
### 5 U.S.C. § 702
### APA Failure to Provide Review of SHU Placement

242.    Plaintiff realleges and incorporates each and every allegation contained in the preceding paragraphs.

243.    Defendant BOP is an agency generally subjected to the APA.

244.    The APA requires that agencies follow their own procedures where the rights of individuals are affected. 5 U.S.C. § 706(2)(D).

245.    Defendant Bureau of Prisons, by and through officials at FCI Florence and Englewood, unlawfully violated its own agency regulation at 28 C.F.R. § 541.26 and Mr. King's rights to Due Process insofar as the agency has for over four years failed to conduct a single review or to allow Mr. King to be heard regarding Mr. King's placement in the Special Housing Unit, causing Mr. King to suffer prolonged isolation and extreme confinement in violation of the Eighth Amendment prohibition on cruel and unusual punishment and the Mandela Rules for Treatment of Prisoners.

246.    Defendant BOP is liable to Plaintiff for statutory attorneys' fees and costs according to proof, pursuant to 28 U.S.C. 2412; and for such other and further relief as the Court deems just and proper.

## Count Twenty:
### 5 U.S.C. § 702
### APA Abusive Use of Restraint Device in Absence of Authorization

247.    Plaintiff realleges and incorporates each and every allegation contained in the preceding paragraphs.

248.    On August 17, 2018, Defendant Bureau of Prisons, by and through officials at FCI Florence, unlawfully used force and restrained Mr. King using the "Stryker Chair," a restraint device completely unauthorized by agency regulations governing use of force and application of physical restraint at 28 C.F.R. § 552.20 et seq.

249.    Use of the unauthorized restraint device occurred in the absence of authority for such restrain and in violation of Mr. King's right to Due Process insofar as the agencies regulations do not contemplate or authorize such full bodily ambulatory restraint of prisoners as punishment, causing Mr. King injury and suffering in violation of the Eighth Amendment prohibition on cruel and unusual punishment and the Mandela Rules for Treatment of Prisoners.

250.    Defendant BOP is liable to Plaintiff for statutory attorneys' fees and costs according to proof, pursuant to 28 U.S.C. 2412; and for such other and further relief as the Court deems just and proper.


## PRAYER FOR RELIEF

 **WHEREFORE** Plaintiff Mr. Eric King respectfully requests that this Court enter judgement in his favor and against all Defendants, and grant:

a)  Appropriate declaratory and other injunctive or equitable relief

b)  Compensatory and consequential damages including for emotional distress, humiliation, and other pain and suffering on all claims allowed by law

c)  All economic losses on all claims suffered so far

d)  Punitive damages on all claims allowed by law in an amount to be determined at trial

e)  Attorney fees and costs associated with this action

f)  Pre and post judgement interest at the reasonable rate

g) Any further relief that the Court deems just and proper

Respectfully submitted February 21, 2023,

ERIC KING, Plaintiff

By Counsel

*/s/ Sandra C. Freeman*
Sandra C. Freeman
Law Office of Sandra C. Freeman, LLC
224 W. Rainbow Blvd #103
Salida, Colorado 81201
sandra@sandrafreemanlaw.com

*/s/ Jenipher R. Jones*
A People's Law Office
110 16th Street
Suite 1400
# 1001
Denver, CO 80202
Fax: 720.796.9408
Tel. 720.459.9333 or 720.380.4408 (Direct)
jenipherj@dolawllc.com

**CERTIFICATE OF SERVICE**

I hereby certify that on February 21, 2023, I electronically filed the foregoing

document with the Clerk of Court using the CM/ECF system which will send notification of

such filing to all other counsel of record.

Andrew Soler
Assistant United States Attorney]
Andrew.Soler@usdoj.gov
Counsel for Defendants Bureau of Prisons and United States


*/s/ Sandra C. Freeman*
Sandra C. Freeman, Attorney at Law
Counsel for Eric King

74